Deborah Fishman (Bar No. 197584)
**ARNOLD & PORTER KAYE SCHOLER LLP**
3000 El Camino Real
Five Palo Alto Square, Suite 500
Palo Alto, CA 94306-3807
Telephone: (650) 319-4500
Fax: (650) 319-4700
Email: Deborah.Fishman@arnoldporter.com

Abigail Struthers (*pro hac vice*)
Caleb Thompson (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-7915
Fax: (212) 836-8689
Email: Abigail.Struthers@arnoldporter.com
Email: Caleb.Thompson@arnoldporter.com

Hannah Beiderwieden (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave, NW
Washington, DC 20001-3743
Telephone: (202) 942-5468
Fax: (202) 942-5999
Email: Hannah.Beiderwieden@arnoldporter.com

*Counsel for Defendant Nerviano Medical Sciences S.r.l.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CARDIFF ONCOLOGY, INC., | Case No. 3:26-cv-03131-RBM-JLB |
| Plaintiff, | **ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS FOR:** |
| v. | **(1) CORRECTION OF INVENTORSHIP** |
| NERVIANO MEDICAL SCIENCES S.r.l., | **(2) DECLARATORY JUDGMENT OF JOINT INVENTION** |
| Defendant. | **(3) BREACH OF CONTRACT (JOINT OWNERSHIP)** |
| | **(4) BREACH OF CONTRACT (JOINT INVENTION PROSECUTION)** |
| | **(5) BREACH OF IMPLIED COVENANT** |
| | **(6) BREACH OF CONTRACT (CRE)** |
| | **(7) DECLARATORY JUDGMENT OF TERMINATION** |

Defendant Nerviano Medical Sciences S.r.l. ("Nerviano"), by and through its undersigned counsel, hereby responds to the Complaint filed by Plaintiff Cardiff Oncology, Inc. ("Cardiff") as follows:

**<u>INTRODUCTION</u>**

This case is about Cardiff's mismanaged development of a potentially game-changing cancer drug – first discovered and developed by Nerviano – and Cardiff's breaches of the License Agreement that gave Cardiff rights to the drug in the first place. Those breaches have deprived Nerviano of the benefits of its bargain and have denied patients timely access to this novel drug.

The drug at issue is called onvansertib. Nerviano discovered onvansertib through the work of its Principal Scientist and former Head of Biotechnology, Dr. Barbara Valsasina. Under Dr. Valsasina's supervision, Nerviano spent years and considerable resources developing onvansertib – taking it through preclinical research, IND enabling studies, and an FDA-registered Phase I clinical trial in humans. That trial showed the drug has significant promise in treating cancer patients through inhibiting an enzyme ("PLK1") that drives the growth of certain cancerous tumors. This included demonstrating that the drug was safe, determining the optimal dose to be administered to cancer patients in future clinical studies, and providing an indication of superior efficacy in selected cancer patients.

Nerviano sought a global development partner to complete the process of bringing onvansertib to regulatory approval and making it broadly available to patients. In 2017, it reached an agreement with Trovagene[1] (hereinafter "Cardiff") for that purpose. The License Agreement gave Cardiff exclusive worldwide rights to Nerviano's patents and Know-How[2] related to onvansertib for a modest up-front fee of $2 million, with future compensation to Nerviano in the form of milestones and

---

[1] According to Cardiff's Complaint, Cardiff is the successor by name change to Trovagene, Inc.

[2] Unless otherwise defined, capitalized terms used herein have the meaning ascribed to them in the License Agreement.

royalties tied to successful development and commercialization.  But Cardiff's rights to develop onvansertib came with contractual obligations. Cardiff had to respect Nerviano's rights in Joint Inventions, use Commercially Reasonable Efforts to develop and win regulatory approval for onvansertib ███████████████ ██████████████, and – if Nerviano terminated the Agreement for cause – transition the onvansertib program back to Nerviano so development could continue without delay.  When Cardiff took the license, onvansertib was the only treatment of its kind in clinical development for PLK1-driven cancerous tumors. Nerviano trusted Cardiff to develop this new drug and deliver it to patients quickly. Cardiff has not done that.

Cardiff's development of onvansertib has been slow and unsteady at best. Cardiff blew deadlines, made poor clinical design and development choices, failed to engage meaningfully with Nerviano's communications, and ███████████ ████████████████████████████████. Nine years after the License Agreement took effect – and despite having received Nerviano's completed Phase I data package – Cardiff has gotten onvansertib only to an End-of-Phase 2 meeting with the FDA. Nerviano has tried to intervene since 2022 when new management with significant clinical development experience joined Nerviano, but to no avail. Over the last year alone, Nerviano expressed its concerns on several occasions, requested information, and offered guidance. Cardiff stonewalled it at every turn.

Cardiff has cycled through five Chief Medical Officers ("CMOs") since 2017 – four changes since mid-2021 alone – reflecting a chaotic approach to clinical development.  The situation reached a breaking point in early 2026 when Cardiff's Board ████████████████████████████████████ ██████ ████████ █████ █████████████ ████ ████ ████ █████████ ███ ███████████████████████████████. Worse still, ████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ █████████████████████████████████.

Nerviano hoped new management might change things. It has not. Despite acknowledging failures of past management, Cardiff's new CEO continues to make commercially unreasonable decisions about the development of onvansertib ███ ███████████████████████████████████████████ That intransigence follows ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████ – concerns Cardiff appears determined to ignore.

Cardiff's mismanagement has put patients at risk of never receiving a drug that could benefit them – and has ███████████████████████████████████, assuming Cardiff can even get it through clinical trials and to approval. Worse, Cardiff has recently disclosed that ██████████████████████████████ ████████████████████████████████████. In its 2025 Annual Report, Cardiff acknowledged "a substantial doubt about [its] ability to continue as a going concern, which may hinder [its] ability to obtain future financing on terms acceptable to [it], if at all" – only deepening Nerviano's concerns about whether Cardiff can see this program through.

Cardiff's failure to use Commercially Reasonable Efforts has jeopardized onvansertib's availability to patients in need, ██████████████████████████, and caused – and will continue to cause – serious harm to Nerviano. The unnecessary delays Cardiff has caused likely mean that onvansertib will not reach the commercial market before the Nerviano compound patent expires. If Cardiff were ultimately to succeed, it would be launching into a market without compound patent protection. By then, it may be too late to for Nerviano to see any return on the drug it discovered, developed, and entrusted to Cardiff.

Cardiff has also refused to recognize Nerviano's rights in patents covering treatment of a subset of colorectal cancer patients with onvansertib and bevacizumab – inventive methods to which Nerviano's Dr. Valsasina made significant inventive contributions. Cardiff declined to pursue broader patent claims on those joint

- 3 -

inventions and then blocked Nerviano's contractual right to do so itself. This is important for Nerviano, both as a matter of principle and because the Royalty Term under the License Agreement is tied to the expiration of the patents, including Joint Inventions, in which Nerviano has rights. By refusing to acknowledge Nerviano's contributions and pursue further patents to Joint Inventions, Cardiff has ensured that by the time onvansertib reaches the market, it will claim to owe Nerviano no royalties at all on a drug Nerviano invented.

In light of all of the above, and after Cardiff refused to cure its breaches despite ample opportunity, Nerviano found itself with little option but to terminate the Agreement. It then engaged Cardiff in what Nerviano believed to be good-faith negotiations to resolve the parties' disputes. That good faith was one-sided. Under the pretense of wanting to negotiate, Cardiff induced Nerviano to withdraw its original termination – claiming that, absent withdrawal, Cardiff would be harmed by mandatory public disclosure of the parties' dispute. Nerviano honored that request. Three weeks later, Cardiff filed this lawsuit, making false allegations of coercive and bad-faith behavior and putting the parties' dispute squarely in the public eye – the very harm Cardiff had claimed to want to avoid.

Nerviano responds to Cardiff's meritless complaint by bringing counterclaims for damages and specific performance: to require Cardiff to comply with the parties' Agreement, recognize Nerviano's contributions to Joint Inventions, and return control of the onvansertib program to Nerviano before Cardiff causes any further damage.

## ANSWER

## INTRODUCTION[3]

1. Cardiff licensed the exclusive, worldwide rights to three patent families relating to the onvansertib molecule from NMS in a License Agreement effective March 13, 2017. Since that time, Cardiff has been actively developing innovative

---

[3] Defendants repeat the headings used by Plaintiff for convenience purposes only. Defendants in no way concede their substance, and to the extent they contain any allegations that require a response, Defendants deny such allegations.

- 4 -

treatment methods involving this drug candidate, including through several ongoing clinical trials of onvansertib in multiple indications. Cardiff has also filed and been issued several patents from the United States Patent and Trademark Office directed to novel methods of treatment involving onvansertib that Cardiff employees invented in connection with their work at Cardiff, including U.S. Patent Nos. 12,144,813 ("the '813 Patent") and 12,263,173 ("the '173 Patent") (together, the "Cardiff Patents") (titled "PLK1 inhibitor in combination with anti-angiogenics for treating metastatic cancer").

**NERVIANO'S ANSWER**: Nerviano admits that it entered into a License Agreement with Cardiff in 2017 relating to onvansertib. Nerviano otherwise denies the remaining allegations and/or legal conclusions contained in paragraph 1.

2. The claimed inventions of the '813 and '173 Patents were conceived of and reduced to practice solely by Cardiff employees and named inventors Maya Ridinger, Ph.D. and Mark Erlander, Ph.D.

**NERVIANO'S ANSWER**: Denied.

3. On February 18, 2026, NMS claimed that Cardiff was in material breach of the License Agreement because Cardiff would not add NMS employee Dr. Barbara Valsasina as a named inventor to the Cardiff Patents or execute a power of attorney for a new continuation patent application so that NMS could purport to act on Cardiff's behalf to add Dr. Valsasina as a named inventor. Cardiff did not add Dr. Valsasina as a named inventor to the Cardiff Patents because she had no involvement in Drs. Ridinger and Erlander's conception or reduction to practice of the claimed inventions of the Cardiff Patents. Rather, upon information and belief, Dr. Valsasina and NMS were not aware of Drs. Ridinger and Erlander's inventions until after their innovative methods had been reduced to practice and Cardiff had filed its patent applications. A patent must accurately name the inventors of the claimed subject matter under an oath or declaration; failure to do so renders the patent invalid. NMS's demand would have therefore required Cardiff to submit false oaths or declarations

- 5 -

to the Patent Office that would invalidate the Cardiff Patents.

**NERVIANO'S ANSWER**: Nerviano admits that it provided Cardiff with notice of material breach of the License Agreement on or before February 18, 2026. Nerviano otherwise denies the allegations contained in paragraph 3.

4.     On April 20, 2026, NMS unilaterally announced that it was terminating the License Agreement, effective immediately, based on Cardiff's failure to add Dr. Valsasina as a named inventor on the Cardiff Patents or provide NMS with a power of attorney under which it could do so through a continuation patent application. NMS demanded, among other things, that Cardiff transfer all regulatory correspondence, development data, and responsibility for the ongoing clinical trials to NMS. NMS purported to withdraw its termination notice on April 24, 2026, but, on information and belief, NMS maintains (and has communicated to Cardiff) its claim that Cardiff is in material breach of the License Agreement, that NMS is free to terminate the License Agreement at any time, and NMS has repeatedly threatened to serve a new notice of termination. Despite Cardiff's repeated efforts, the parties have been unable to resolve this dispute. By attempting to repudiate the contract by manufacturing a so-called breach (where none exists), NMS is opportunistically trying to claim for itself the benefits of Cardiff's years of development work and expenditure of substantial resources.

**NERVIANO'S ANSWER**: Nerviano admits that on April 20, 2026 it terminated the License Agreement due to Cardiff's material breaches, and that on April 24, 2026, at Cardiff's request, it withdrew its termination ██████████████ ███████████████████████ ██████████████████████ ████████████████████ Nerviano otherwise denies the allegations contained in paragraph 4.

5.     The License Agreement does not impose an obligation on Cardiff to add an NMS employee as a named inventor to patents conceived of and reduced to

practice solely by Cardiff's employees. To the contrary, the License Agreement specifically contemplates Cardiff filing, prosecuting, and owning its own patents for its own innovations. Moreover, Cardiff cannot make representations it believes to be untrue to the United States Patent and Trademark Office ("Patent Office") or execute a power of attorney so that another party may make what Cardiff believes to be misrepresentations to the Patent Office. Cardiff did not therefore breach the License Agreement for declining to add an individual who was not a joint inventor to the Cardiff Patents, let alone commit a material breach that would permit NMS to terminate the License Agreement. NMS's attempted termination is therefore void and ineffective.

**NERVIANO'S ANSWER**:  Nerviano denies that the License Agreement does not obligate Cardiff to add an NMS inventor as a named inventor to at least the '813 and '173 Patents. The License Agreement speaks for itself. The remainder of this paragraph contains legal conclusions that do not require a response. To the extent any response is required, Nerviano denies those allegations.

6.    NMS's purported termination and related demands present a real and substantial risk to the cancer patients in the United States currently undergoing treatment pursuant to Cardiff's ongoing clinical trials. NMS's actions not only risk continuity of care for those patients undergoing clinical trials, but they jeopardize the health and safety of those patients too. The potential harm to Cardiff and these patients is immediate and urgent. NMS's allegations of a material breach, threats to terminate, and imminent demand to transfer the clinical trials, intellectual property, and control of the regulatory filings have already and will continue to cause irreparable harm to Cardiff, Cardiff's work with patients, Cardiff's ability to raise capital to advance its drug candidate towards later stages of clinical development and regulatory approval, Cardiff's ability to retain and hire employees, and the integrity of the ongoing clinical trials in patients with cancer, which have broader implications for the development of these important treatments for cancer patients. Cardiff therefore requests preliminary

and permanent injunctive relief from the Court ensuring that NMS continues to perform under the License Agreement and declaratory judgments that Cardiff did not breach the License Agreement, that NMS's purported termination is ineffective, and that Drs. Ridinger and Erlander are the correct inventors on the Cardiff Patents. Cardiff further requests all other available remedies in law and equity, including damages, resulting from NMS's conduct and breaches of the License Agreement and the implied covenant of good faith and fair dealing.

**NERVIANO'S ANSWER**: Nerviano denies that vindication of its legal rights will cause harm to any patients enrolled in Cardiff's clinical trials. Nerviano has a track record of conducting clinical studies in the United States, in meeting legal and ethical requirements to run such studies and currently has two clinical studies running for other cancer drugs in the United States. Nerviano also denies that any alleged harm to Cardiff is the proximate result of Nerviano's conduct as opposed to Cardiff's own acts and omissions. Nerviano advised Cardiff of its misjoinder of inventors more than eight months ago and suggested that legal action may be necessary to correct inventorship if Cardiff refused to do so seven months ago. Even if Cardiff's erroneous view of inventorship were correct (it is not), it has cited no case (and Nerviano is aware of none) where a patent has been invalidated for naming too many inventors. Nerviano further denies that Cardiff is entitled to any relief at law or in equity. The remainder of this paragraph contains legal conclusions that do not require a response. To the extent any response is required, Nerviano denies those allegations.

## THE PARTIES

7. Cardiff is a U.S. corporation registered under the laws of the State of Delaware, with a principal place of business located at 11055 Flintkote Ave., San Diego, CA 92121. Cardiff is the successor by name change to Trovagene, Inc.

**NERVIANO'S ANSWER**: Nerviano admits that Cardiff is the successor by name change to Trovagene, Inc. Nerviano lacks knowledge or information sufficient to

form a belief as to the truth of the other matters alleged in paragraph 7, and therefore denies any and all allegations and/or legal conclusions contained therein.

8.     Cardiff is a San Diego-based, clinical-stage biotechnology company founded in 1999 that leverages PLK1 inhibition to develop novel therapies across a range of cancers with the greatest unmet medical need. Its lead drug candidate is onvansertib, an oral, small molecule drug candidate that is a PLK1 inhibitor designed to treat patients with various cancers, including those for which there are few, if any, effective therapies currently available, such as metastatic RAS-mutated colorectal cancer. Cardiff is a development stage company that does not yet have a commercial product. Cardiff does not therefore have any current revenues from the sale of drug products. Cardiff has fewer than 35 employees.

**NERVIANO'S ANSWER**: Nerviano admits that Cardiff's lead drug candidate is onvansertib, and that onvansertib is an oral, small molecule drug candidate that is a selective PLK1 inhibitor designed to treat patients with various cancers, including those for which there are few, if any, effective therapies currently available, such as metastatic KRAS-mutated colorectal cancer. Nerviano lacks knowledge or information sufficient to form a belief as to the truth of the matters alleged in paragraph 8, and therefore denies any and all allegations and/or legal conclusions contained therein.

9.     On information and belief, NMS is an Italian company registered under the laws of Italy, with its registered office located at viale Pasteur, 10, 20014 Nerviano, Italy. NMS states on its website that it has a location at 1 Broadway, Cambridge, Massachusetts. *See* https://www.nervianoms.com/about-us/#locations (Nerviano Medical Sciences: "Locations") (last accessed May 15, 2026). On information and belief, NMS operates its business at the Massachusetts location under the name Nerviano Medical Sciences, Inc., a Delaware corporation (Nerviano Medical Sciences, S.r.l. and Nerviano Medical Sciences, Inc. are collectively referred

to herein as "NMS").[4] On information and belief, NMS's Massachusetts entity is a mere alter ego and instrumentality of the Italian entity. The entities have the same ultimate leadership. For example, NMS's Chief Executive Officer Hugues Dolgos serves as Chairman and is a Director of Nerviano Medical Sciences, Inc., and NMS's Chief Medical Officer and Board member Lisa Mahnke is the Chief Executive Officer, President, and Director of the Massachusetts entity. *See* https://corp.sec.state. ma.us/CorpWeb/CorpSearch/CorpSummary.aspx?sysvalue=aHSSlmRV7N4nR.zW CQUq6tl_LktTs6evYUedXSQ3am8- (Business Entity Summary for: Nerviano Medical Sciences, Inc.") (last accessed May 18, 2026). In addition, the Massachusetts entity is operated as a department of NMS and lacks traditional corporate offices but instead operates out of an office sharing location.

**NERVIANO'S ANSWER**: Nerviano admits that Nerviano Medical Sciences, S.r.l. is an Italian company registered under the laws of Italy. Nerviano Medical Sciences Inc. has been dismissed from this suit by stipulation and, accordingly, the factual allegations regarding Nerviano Medical Sciences Inc. do not require a response. The remainder of this paragraph contains legal conclusions that do not require a response. To the extent any response is required, Nerviano denies those allegations.

10.    On information and belief, NMS is a clinical-stage biopharmaceutical company affiliated with NMS Group S.p.A. NMS Group S.p.A describes itself as "one of the largest companies committed to innovation, research, and development in oncology." See https://www.nmsgroup.it/ (NMS Group: "About Us") (last accessed May 15, 2026).

**NERVIANO'S ANSWER**:  Nerviano admits that NMS S.r.l. is a clinical-stage biopharmaceutical company and is affiliated with NMS Group S.r.l. NMS Group's website describes itself as "the largest company *in Italy* committed to oncology

---

[4] In its Complaint, Cardiff defines "NMS" to include Nerviano Medical Sciences, S.r.l. and Nerviano Medical Sciences, Inc. On June 8, 2026, Cardiff dismissed Nerviano Medical Sciences from the case. D.N. 13. Consequently, for purposes of this Answer, Nerviano interprets "NMS" to include only Nerviano Medical Sciences, S.r.l.

innovation…" https://www.nmsgroup.it/ (emphasis added). Nerviano denies that it is affiliated with "NMS Group S.p.A."

**JURISDICTION AND VENUE**

11.    This case arises under the patent laws of the United States. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338 because this Court has exclusive jurisdiction over claims arising under the patent laws of the United States, including inventorship claims. Specifically, NMS alleges that Cardiff materially breached the License Agreement based on NMS's allegations under 35 U.S.C. §§ 116 and 256 that Cardiff incorrectly omitted and failed to add an inventor on the Cardiff Patents. In order to determine whether the requested injunctive and declaratory judgment relief is appropriate here, the Court will need to determine inventorship of the Cardiff Patents and whether Cardiff's good faith inventorship determinations are a material breach of the License Agreement. Patent inventorship is a question of U.S. patent law. Because patent inventorship under federal law is a predicate to determine Cardiff's entitlement to the requested injunctive and declaratory relief, inventorship is necessarily raised by the claims in this case. As explained below, the parties have an actual dispute as to inventorship, as evidenced by NMS's ongoing campaign to change the inventorship of the Cardiff Patents and the parties' continuing discussions and disagreement over the inventorship issue. Moreover, issues of inventorship are substantial questions of federal patent law sufficient to support jurisdiction under Section 1338. Finally, jurisdiction under 28 U.S.C. § 1338 is proper because federal courts have a recognized interest in exercising jurisdiction over patent law issues. This Court also has jurisdiction under 28 U.S.C. §§ 2201 and 2202 to award declaratory relief and "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201.

**NERVIANO'S ANSWER**: Nerviano admits that this Court has jurisdiction over this dispute. The remainder of this paragraph contains legal conclusions that do not require a response. To the extent any response is required, Nerviano denies those allegations.

12. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2) because the parties are completely diverse, wherein Cardiff is a citizen of the State of California and NMS is a citizen of the Nation of Italy. Further, the amount in controversy, including the value of the requested injunctive relief, exceeds $75,000.00, exclusive of interest, costs, and fees. Specifically, NMS's assertion that Cardiff materially breached the contract, and that NMS is free to terminate the License Agreement, interferes with Cardiff's ability to fundraise and continue its clinical trial work in patients with the onvansertib product. Cardiff stands to lose hundreds of millions of dollars (or more) of sales of the onvansertib product.

**NERVIANO'S ANSWER**: Nerviano admits that this Court has jurisdiction over this dispute. Nerviano further admits that it is a citizen of Italy. The remainder of this paragraph contains legal conclusions that do not require a response. To the extent any response is required, Nerviano denies those allegations.

13. This Court has personal jurisdiction over NMS pursuant to the California Long Arm Statute, Cal. Civ. Proc. Code § 410.10, because NMS has purposefully availed itself of the privilege of conducting business in the State of California and in this District and because this lawsuit arises out of or relates to NMS's specific, purposeful contacts with California. Specifically, on information and belief, NMS regularly conducts, transacts, and solicits business within this District, and has done so continuously and systematically. For example, NMS entered into contracts to be performed, in whole or in part, within this District, including the License Agreement. NMS entered into the License Agreement with and received payments from San Diego-based Cardiff through that License Agreement. See generally Ex. A. By way of further example, NMS agreed to conduct twice per year joint development committee meetings with Cardiff that alternate between Italy and California. Ex. A.

at § 7.1(c). Accordingly, in the License Agreement, NMS agreed to, and on information and belief did, attend annual joint development committee meetings in this District in California relevant to the parties' dispute. The License Agreement also calls for the creation of a Joint Development Plan. Ex. A. at §§ 1.13, 7.2. Cardiff created this plan in California. Further, the inventions described in the Cardiff Patents were conceived of and reduced to practice in this District by individuals residing in this District. Cardiff conducted at least a substantial portion of its drug development work in connection with the License Agreement in this District, and NMS sent its notice of termination and demands in connection to inventorship to Cardiff in this District. This lawsuit therefore arises out of NMS's continuous and systematic business activities and contacts with the State of California and this District specifically.

**NERVIANO'S ANSWER**:  Nerviano does not contest personal jurisdiction for purposes of resolving this dispute. The remainder of this paragraph contains legal conclusions that do not require a response. To the extent any response is required, Nerviano denies those allegations.

14.    Venue is therefore proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c). As noted above, a substantial part of the events or omissions giving rise to the claim occurred in this District, including but not limited to NMS and Cardiff's work under the License Agreement, Drs. Ridinger and Erlander's inventorship of the Cardiff Patents, and NMS's claims of alleged material breach and threats to terminate the License Agreement. In the alternative, venue is proper under 28 U.S.C. § 1391(b)(3) because NMS is subject to personal jurisdiction in this District and there is no other district in which this action may otherwise be brought. In addition, since NMS is not resident in the United States, this action may be brought in any judicial district. See Fed. R. Civ. P. 4(k)(2).

**NERVIANO'S  ANSWER**: Nerviano does not contest venue for purposes of resolving this dispute. The remainder of this paragraph contains legal conclusions that

- 13 -

do not require a response.  To the extent any response is required, Nerviano denies those allegations.

## BACKGROUND

### A.    Cardiff's Clinical Development of Onvansertib Treatment

15.    Polo-like kinase 1 ("PLK1") is a serine/threonine kinase that plays an important role in cellular processes, including cell cycle progression, differentiation, survival, DNA damage response, autophagy, apoptosis, and cytokine signaling. PLK1 plays a crucial role in cell cycle regulation and cancer development, and combining PLK1 inhibitors with other therapies may improve efficacy of cancer therapeutics as compared to monotherapy.

**NERVIANO'S ANSWER**:  Admitted.

16.    Cardiff is a clinical-stage biotechnology company focused on leveraging PLK1 inhibition to develop novel therapies across a range of cancers with the greatest unmet medical need. Its goal is to target tumor vulnerabilities with treatment combinations of onvansertib, an oral and highly selective PLK1 inhibitor, and standard-of-care ("SoC") therapeutics. Cardiff licensed onvansertib from NMS pursuant to the License Agreement. Cardiff's lead clinical program is directed to RAS-mutated metastatic colorectal cancer. This is an area of high unmet medical need. According to the U.S. Centers for Disease Control and Prevention, "colorectal cancer is the fourth most common cancer in men and women" and "the fourth leading cause of cancer-related deaths in the United States." See https://www.cdc.gov/colorectal-cancer/statistics/index.html ("Colorectal Cancer Statistics") (last accessed May 17, 2026).

**NERVIANO'S ANSWER**:  Nerviano admits that it entered into a License Agreement with Cardiff in 2017 relating to onvansertib.  The U.S. Centers for Disease Control and Prevention website speaks for itself.  Nerviano lacks knowledge or information sufficient to form a belief as to the truth of the remaining matters alleged

in paragraph 16, and therefore denies the allegations and/or legal conclusions contained therein.

17.    Cardiff is currently sponsoring and overseeing the CRDF-004 clinical trial, which is a randomized dose-finding Phase II clinical trial evaluating onvansertib in combination with standard of care (SoC) regimens (FOLFIRI/bevacizumab ("bev") or FOLFOX/bev) in patients with first-line RAS-mutated metastatic colorectal cancer (mCRC). The CRDF-004 trial enrolled 110 patients in the intent-to-treat population. Cardiff is currently scheduled to present interim data from the CRDF-004 study at the 2026 American Society of Clinical Oncology (ASCO) Annual Meeting scheduled for May 29-June 2, 2026. Cardiff is also supplying the drug and supporting several investigator-initiated trials evaluating onvansertib in multiple solid tumors, including first-line metastatic pancreatic ductal adenocarcinoma (mPDAC), relapsed small cell lung cancer (SCLC), unresectable locally advanced or metastatic triple negative breast cancer (TNBC), and chronic myelomonocytic leukemia (CMML).

**NERVIANO'S ANSWER**: Nerviano lacks knowledge or information sufficient to form a belief as to the truth of the remaining matters alleged in paragraph 17, and therefore denies any and all allegations and/or legal conclusions contained therein.

**B.    The License Agreement**

18.    Cardiff and NMS entered into the License Agreement on March 13, 2017. A true and correct printout of the publicly-filed text from the License Agreement included in Cardiff's Annual Report on Form 10-K filed on March 15, 2017 is attached as Exhibit A.

**NERVIANO'S ANSWER**:    Nerviano admits that it entered into a License Agreement with Trovagene, to which Cardiff is the successor by name change, in 2017 relating to onvansertib.  Nerviano lacks knowledge or information sufficient to form a belief as to the truth of the remaining matters alleged in paragraph 18, and therefore denies any and all allegations and/or legal conclusions contained therein.

19.    On information and belief, NMS develops compounds for the treatment

- 15 -

of oncology diseases and owns or otherwise has certain intellectual property rights in the active pharmaceutical ingredient referred to herein as onvansertib.

**NERVIANO'S ANSWER**: Admitted.

20.    Pursuant to Section 3.1(a) of the License Agreement, NMS granted Cardiff (then Trovagene, Inc.), among other things, an exclusive license to conduct research and to develop, make, have made, use, offer for sale, sell, import, and otherwise exploit the licensed intellectual property rights. Ex. A at § 3.1. Cardiff paid a non-refundable, non-creditable initial fee of $2,000,000 to NMS for this license. Ex. A at § 4.1(a). The License Agreement also includes provisions for additional license fees, royalties, and milestone payments. *See, e.g., id*. at § 4 ("Financial Considerations"). Cardiff has fully complied with its financial obligations under the License Agreement. In short, NMS has been fully compensated for the licensed rights under the negotiated and agreed terms of the License Agreement to date.

**NERVIANO'S ANSWER**:  The License Agreement speaks for itself.  The remainder of paragraph 20 contains legal conclusions that do not require a response.  To the extent any response is required, Nerviano denies those allegations.

21.    The License Agreement contemplated the development of new inventions and specified ownership for three categories of inventions: (1) "After-Developed [NMS] Inventions," (2) inventions by Cardiff's employees or others acting on its behalf, and (3) "Joint Inventions." Ex. A at § 10.2.

**NERVIANO'S ANSWER**: The License Agreement speaks for itself.  The remainder of paragraph 21 contains legal conclusions that do not require a response.  To the extent any response is required, Nerviano denies those allegations.

22.    "Joint Inventions" are defined in the License Agreement as:

> Inventions for which it is determined, in accordance with United States patent law, that both: (i) one or more employees, consultants or agents of [NMS] or any other persons obligated to assign such Invention to [NMS]; and (ii) one or more employees, consultants or agents of [Cardiff] or any other persons obligated to assign such Invention to [Cardiff], are joint inventors.

Ex. A at § 10.2(c). Cardiff is not aware of any Joint Inventions under the License Agreement; there have been no inventions for which it has been determined, in accordance with United States patent law, that one or more employees, consultants, or agents of NMS and Cardiff are joint inventors.

**NERVIANO'S ANSWER**: The License Agreement speaks for itself. Nerviano denies that Cardiff is unaware that U.S. Patent Nos. 12,144,813 and 12,263,173 are Joint Inventions. The remainder of paragraph 22 contains legal conclusions that do not require a response. To the extent any response is required, Nerviano denies those allegations.

23. The License Agreement specifies that Cardiff shall own all inventions made solely by its employees.

> [Cardiff] shall own the entire right, title and interest in and to all Inventions (including all patents and other intellectual property rights thereto) made solely by its employees or others acting on behalf of [Cardiff] (or solely by such persons and Third Parties performing work for [Cardiff]) in the performance of the Development Plan or other activities undertaken under this Agreement[.]

Ex. A at 10.2(b).

**NERVIANO'S ANSWER**: The License Agreement speaks for itself. The remainder of paragraph 23 contains legal conclusions that do not require a response. To the extent any response is required, Nerviano denies those allegations.

24. The License Agreement also addresses the parties' expectations for the "Prosecution of Patents." Ex. A at § 10.3. For "Sole Inventions":

> … each Party shall have the right to: (i) determine whether patent applications should be filed on Inventions owned by it (other than Joint Inventions), and if so, where and when; (ii) control the prosecution and procurement of any such patents …, including their issuance, reissuance, reexamination and the defense of any interference, revocation or opposition proceedings, and to decide in which countries to maintain such patents when issued and for how long; ….

Ex. A at § 10.3(a).

**NERVIANO'S ANSWER**: The License Agreement speaks for itself.  The remainder of paragraph 24 contains legal conclusions that do not require a response.  To the extent any response is required, Nerviano denies those allegations.

25.    The License Agreement addresses and gives Cardiff discretion with respect to any "Joint Inventions." It also provides explicitly that any decision by Cardiff not to prosecute patents for Joint Inventions is not a breach of the License Agreement:

> [Cardiff] shall be responsible for filing patent applications on, and directing the particulars (as described in Section 10.3(a)) of the patent prosecution for all Joint Inventions at its own cost and expense. [Cardiff] will exercise its reasonable efforts to keep [NMS] informed of significant steps taken in such matters. With respect to the prosecution of patent applications for Joint Inventions, [Cardiff] shall have the further right to take such actions as are necessary or appropriate to procure and maintain patents with respect thereto….

> If, in its sole discretion, [Cardiff] decides not to file a patent application on any Joint Invention, or ceases to diligently pursue prosecution or procurement, or fails to maintain the same in any country, that decision, cessation, or failure will not constitute a default under this Agreement. Rather, [NMS] shall then have the right, at its sole expense and in its sole discretion, to file patent applications, control prosecution and procurement, and maintain procured patents with respect to such Joint Invention….

Ex. A. at § 10.3(b). Cardiff is not aware of any Joint Inventions under the License Agreement. On information and belief, NMS has not elected to undertake the prosecution, procurement, or maintenance of any alleged Joint Invention.

**NERVIANO'S  ANSWER**: The License Agreement speaks for itself.  Nerviano denies that Cardiff is unaware that U.S. Patent Nos. 12,144,813 and 12,263,173 are Joint Inventions.  Nerviano further denies that it has not elected to undertake the prosecution of Joint Inventions intellectual property.  The remainder of paragraph 25 contains legal conclusions that do not require a response.  To the extent any response is required, Nerviano denies those allegations.

26.    The License Agreement can only be terminated by NMS in limited circumstances. Section 11.3 allows for termination for cause, but only "[u]pon

material breach by one Party under this Agreement." Ex. A at § 11.3 (emphasis added).

**NERVIANO'S ANSWER**: The License Agreement speaks for itself.  Nerviano admits that it may terminate the Agreement upon Cardiff's material breach of the Agreement.  The remainder of paragraph 26 contains legal conclusions that do not require a response.  To the extent any response is required, Nerviano denies those allegations.

27.   The parties agreed that the License Agreement "shall be governed by and construed in accordance with the laws of the State of New York (USA), without regard to the conflicts of law principles thereof." Ex. A at § 13.2.

**NERVIANO'S ANSWER**: The License Agreement speaks for itself.  Nerviano otherwise admits the allegations in paragraph 27.

28.   The parties agreed to certain dispute resolution terms (including arbitration) in Section 13.4. Relevant here, those procedures "shall not prevent either Party from seeking preliminary or permanent injunctive relief with respect to breaches of obligations under this Agreement in any appropriate jurisdiction." Ex. A at § 13.4(c). Cardiff seeks preliminary and permanent injunctive relief with respect to NMS's breaches of obligations under this License Agreement in this Court, which is an appropriate jurisdiction for resolution as set forth above.

**NERVIANO'S ANSWER**: The License Agreement speaks for itself.  The remainder of paragraph 28 contains legal conclusions that do not require a response.  To the extent any response is required, Nerviano denies those allegations.

C.     **The Cardiff Patents**

29.   Mark Erlander, Ph.D. joined Cardiff as its Chief Scientific Officer in or around March 2013. Dr. Erlander served as Cardiff's Chief Executive Officer from 2020 to March 2026. Maya Ridinger, Ph.D. is a Senior Director of Research and Development at Cardiff and joined Cardiff in or around September 2017. Drs. Erlander and Ridinger both worked in development of onvansertib.

**NERVIANO'S ANSWER**: Nerviano lacks knowledge or information sufficient to form a belief as to the truth of the matters alleged in paragraph 29, and therefore denies any and all allegations and/or legal conclusions contained therein.

30.    Drs. Erlander and Ridinger conceived of novel therapeutic methods of use for onvansertib in connection with their work for Cardiff. On September 11, 2022 and July 26, 2023, Cardiff filed provisional patent application Nos. 63/405,466 and 63/515,831, and subsequent U.S. Patent Application Nos. 18/750,971 and 18/751,014. After prosecution, the United States Patent and Trademark Office duly issued the '813 and '173 Patents to Cardiff on November 19, 2024 and April 1, 2025, respectively. No NMS employee contributed to the novel aspects of the inventions claimed in the Cardiff Patents.

**NERVIANO'S ANSWER**: Nerviano denies the allegation that no Nerviano employee contributed to the novel aspects of the '813 and '173 Patents.   The remainder of paragraph 30 contains legal conclusions that do not require a response. To the extent any response is required, Nerviano denies those allegations.

31.    A true and correct copy of the '813 Patent is attached as Exhibit B.

**NERVIANO'S ANSWER**: Admitted.

32.    A true and correct copy of the '173 Patent is attached as Exhibit C.

**NERVIANO'S ANSWER**: Admitted.

33.    The '813 and '173 Patents are Cardiff Inventions. Under Section 10.2 of the License Agreement, described above, Cardiff "shall own the entire right, title and interest in and to all Inventions (including all patents and other intellectual property rights thereto) made solely by its employees or others acting on behalf of [Cardiff] … in the performance of the Development Plan or other activities undertaken under this Agreement[.]" Ex. A at § 10.2(b). Under the License Agreement, Cardiff has the right to determine whether to file patent applications and control the prosecution and procurement of any such patents. Id. at § 10.3(a).

**NERVIANO'S ANSWER**: Nerviano denies that the '813 and '173 are Cardiff Inventions. The License Agreement speaks for itself. The remainder of paragraph 33 contains legal conclusions that do not require a response. To the extent any response is required, Nerviano denies those allegations.

34. The '813 and '173 Patents are not Joint Inventions because no NMS employee, consultant, agent, or any other person obligated to assign an invention to NMS is a joint inventor to the Cardiff Patents.

**NERVIANO'S ANSWER**: Denied.

35. Even if the Cardiff Patents were Joint Inventions, which they are not, Section 10.3(b) of the License Agreement states that Cardiff has sole discretion to decide whether to file patent applications on Joint Inventions and direct the particulars of patent prosecution for all Joint Inventions at its own cost and expense. The parties specifically contemplated and determined that Cardiff's exercise of its sole discretion cannot be a default under the License Agreement. Notably, Section 10.3(b) expressly states:

> If, in its sole discretion, [Cardiff] decides not to file a patent application on any Joint Invention, or ceases to diligently pursue prosecution or procurement, or fails to maintain the same in any country, that decision, cessation, or failure will not constitute a default under this Agreement.

> Rather, [NMS] shall then have the right, at its sole expense and in its sole discretion, to file patent applications, control prosecution and procurement, and maintain procured patents with respect to such Joint Invention.

Ex. A at § 10.3(b). On information and belief, NMS has never purported to file any patent applications directed to an alleged Joint Invention. NMS has instead demanded that Cardiff execute a power of attorney to enable NMS to file patent applications claiming priority to the Cardiff Patents on Cardiff's behalf so that NMS can unilaterally add its employee as a named inventor. There is no obligation under the License Agreement for Cardiff to do so. Moreover, a power of attorney is not a prerequisite to filing a patent application.

**NERVIANO'S ANSWER**: The License Agreement speaks for itself. Nerviano admits that Cardiff refused Nerviano's request that Cardiff file a patent application directed to a Joint Invention, and that Cardiff further refused to execute a power of attorney to enable Nerviano to exercise Nerviano's secondary rights under the Agreement to file a patent application directed to a Joint Invention. The remainder of paragraph 35 contains legal conclusions that do not require a response. To the extent any response is required, Nerviano denies those allegations.

36. Consistent with Cardiff's development activities under the License Agreement over the course of the parties' relationship, Cardiff filed and prosecuted patent applications relating to Inventions arising from its sole work, which resulted in issuance of the '813 and '173 Patents. As explained above, the claimed inventions of the '813 and '173 Patents were conceived of and reduced to practice solely by employees of Cardiff.

**NERVIANO'S ANSWER**: The License Agreement speaks for itself. Nerviano admits that Cardiff filed and prosecuted patent applications which resulted in the issuance of the '813 and '173 Patents. Nerviano denies the remaining allegations of this paragraph.

37. Under U.S. patent law, inventorship is determined on a claim-by-claim basis by the contribution, in some significant manner, to the conception of the invention. "When an invention is made by two or more persons jointly, they shall apply for patent jointly and each make the required oath, except as otherwise provided in this title." 35 U.S.C. § 116. Section 116 is the statutory locus of the joint inventorship doctrine, which provides a delineation between actual contributions to conception versus, for example, more prosaic alleged contributions to the inventive process. *See Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358-59 (Fed. Cir. 2004). For example, an individual is not a joint inventor (i) if they merely suggest an idea of a result to be accomplished, rather than means of accomplishing it, (ii) where the individual merely assisted the actual inventor after conception, or (iii) where there

- 22 -

was no line of communication between the inventor and purported joint inventor during or in temporal proximity to the inventor's inventive efforts. Id. (internal citations omitted). On information and belief, Dr. Valsasina was involved in NMS's initial development of the onvansertib molecule prior to the License Agreement, and she is a named inventor to certain NMS patents Cardiff licensed from NMS. Dr. Valsasina did not, however, communicate with or otherwise participate in the work of Cardiff employees Drs. Erlander and Ridinger during or in temporal proximity to their inventive efforts that led to the claimed inventions of the Cardiff Patents. Tellingly, the Cardiff Patents do not claim priority to Dr. Valsasina's work or patents; the Cardiff Patents are instead directed to and were found to be patentable by the Patent Office for separate, novel inventions that were conceived in connection with Cardiff's work. A patent must accurately name the inventors of the claimed subject matter under an oath or declaration; failure to do so renders the patent invalid.

**NERVIANO'S ANSWER**: Nerviano admits that Dr. Valsasina is a named inventor on certain NMS patents Cardiff licensed from NMS.  Nerviano further admits that Dr. Valsasina's work on onvansertib includes, but is not limited to, involvement in NMS's initial development of the onvansertib molecule.  Nerviano denies that Dr. Valsasina did not contribute significantly to the conception of the '813 and '173 Patents.  Nerviano further denies that Dr. Valsasina did not "communicate with or otherwise participate in the work of Cardiff employees Drs. Erlander and Ridinger during or in temporal proximity" to their efforts that led to the claimed inventions of the '813 and '173 Patents.  The remainder of paragraph 37 contains legal conclusions that do not require a response.  To the extent any response is required, Nerviano denies those allegations.

38.    Premised on the good-faith and affirmative representations of the Cardiff-affiliated inventors that they jointly conceived the claimed inventions without any involvement from or contribution by Dr. Valsasina, and consistent with the requirements of United States patent law, the named inventors on these two issued

United States patents were correctly identified as Cardiff employees Drs. Erlander and Ridinger.

**NERVIANO'S ANSWER**: Nerviano denies that Dr. Valsasina did not contribute significantly to the conception of the '813 and '173 Patents.  The remainder of paragraph 38 contains legal conclusions that do not require a response.  To the extent any response is required, Nerviano denies those allegations.

> **D.  NMS Demands Its Employee Be Added As A Named Inventor**

39.  On information and belief, NMS began a campaign to extract additional money or other value from Cardiff and the License Agreement in or around September 2024, including through demands that Cardiff agree to extend the royalty term of the License Agreement. NMS's campaign later evolved to demand that an NMS employee (later identified to be Dr. Valsasina) be named as an inventor to the Cardiff Patents even though she did not jointly invent the claimed invention, to achieve a similar royalty-extending result. On information and belief, NMS's attempts to renegotiate the License Agreement stem from NMS's desire to negotiate more advantageous financial terms for the onvansertib drug product.

**NERVIANO'S ANSWER**: Denied.

40.  For example, on or about November 12, 2024, NMS claimed that Cardiff exploited NMS know-how in connection with Cardiff's then-pending patent applications and unilaterally demanded an extension to the previously-agreed royalty term under the License Agreement to increase the potential revenues to NMS.

**NERVIANO'S ANSWER**: Nerviano admits that it sent Cardiff a slide deck on November 12, 2024 raising the fact that Cardiff's published international patent application (WO2024/055039) – *i.e.*, PCT /US2023/073865 – that "covers current main indication" was built on Nerviano Know-How.  Nerviano denies the remaining allegations and/or legal conclusions contained in paragraph 40.

41.  On information and belief, NMS changed its strategy in or around August 2025 and proceeded to send Cardiff a purported list of non-exhaustive examples of

Cardiff patents that NMS claimed cited and/or claimed NMS-invented technology and on which NMS sought to extend the royalty term. Relevant here, NMS claimed that its employee, Dr. Barbara Valsasina, conceived of the potential efficacy of onvansertib with bevacizumab, and that she contributed confidential clinical study information in or about 2017.

**NERVIANO'S ANSWER**: Nerviano admits that it requested Cardiff amend the inventorship of the '813 and '173 Patents to reflect Dr. Valsasina's joint inventorship of those patents.  Nerviano otherwise denies the allegations and/or legal conclusions contained in paragraph 41 and that "NMS changed its strategy in or around August 2025" as Nerviano discussed with Cardiff the inclusion of Nerviano Know-How in Cardiff's published international patent application (WO2024/055039) at the Joint Development Committee ("JDC") meeting on November 11, 2024.

42.   NMS sent a letter to Cardiff dated December 18, 2025, further alleging that "Dr. Valsasina substantially contributed to the conception of onvansertib by (i) providing Cardiff with relevant, non-public information about the efficacy of onvansertib on KRAS-mutated metastatic colorectal cancer; and (ii) recommending that Cardiff select such patients for further investigation and clinical study."

**NERVIANO'S ANSWER**: Nerviano admits that it sent a letter to Cardiff on December 18, 2025 requesting that Cardiff correct the inventorship of the '813 and '173 patents.  The December 18 Letter speaks for itself.

43.   NMS sent a subsequent letter to Cardiff dated February 9, 2026 demanding that Cardiff confirm it would "correct the inventorship of [the '813 and '173 Patents] to add Dr. Valsasina as a joint inventor and provide a date certain for Cardiff taking action before the USPTO to do so."

**NERVIANO'S ANSWER**: Nerviano admits that it sent a letter to Cardiff on February 9, 2026 requesting that Cardiff correct the inventorship of the '813 and '173 patents.  The February 9 Letter speaks for itself.

44.   Then, in a letter dated February 18, 2026, NMS claimed that "Cardiff's

- 25 -

failure to correct the inventorship of U.S. Pat. Nos. 12,144,813 and 12,263,173 to add Dr. Barbara Valsasina as a joint inventor is a material breach of, inter alia, Section 10.2(c) of the License Agreement." NMS further claimed that Cardiff's "failure to file a joint invention continuation patent application as requested by [NMS] or, in the alternative, to execute a Power of Attorney so that [NMS] may file such application at its own expense" was a purported material breach of Section 10.3 of the License Agreement.

**NERVIANO'S ANSWER**: Nerviano admits that it sent a letter to Cardiff on February 18, 2026 notifying Cardiff that its failure, despite repeated requests, to correct the inventorship of the '813 and '173 patents constituted a material breach of the License Agreement. The February 18 Letter speaks for itself.

45.    Through this correspondence, NMS asserted that Cardiff's alleged material breach entitled NMS to terminate the License Agreement for cause under Section 11.3 of the License Agreement.

**NERVIANO'S ANSWER**: The License Agreement, December 18, 2025 Letter, February 9, 2026 Letter and February 18, 2026 Letter speak for themselves. Nerviano denies any allegations and/or legal conclusions contrary thereto.

46.    Cardiff responded to NMS's communications, consistently maintaining its position that no breach, let alone a material breach, had occurred in connection with Cardiff's good faith identification of Drs. Ridinger and Erlander as the named inventors of the claimed inventions of the Cardiff Patents.

**NERVIANO'S ANSWER**: Cardiff's correspondence with Nerviano speaks for itself. Nerviano denies any allegations and/or legal conclusions contrary thereto.

47.    For example, on January 30, 2026, Cardiff sent NMS an email explaining that NMS's claims regarding Dr. Valsasina did not meet the legal standard for inventorship. The email explained that "[t]he threshold question in determining inventorship is who conceived the invention. Unless a person contributes to the conception of the invention, he is not an inventor." MPEP § 2109 (citations omitted)

- 26 -

(emphasis added). Even if NMS's claims that Dr. Valsasina had suggested areas to investigate prior to the License Agreement were true "one who suggests an idea of a result to be accomplished, rather than the means of accomplishing it, is not a[] coinventor." *Id*. (quoting *Ex parte Smernoff*, 215 USPQ 545, 547 (Bd. App. 1982).)

**NERVIANO'S ANSWER**: The January 30, 2026 email speaks for itself. Nerviano denies the allegation of fact contained therein. The remainder of paragraph 47 contains legal conclusions that do not require a response.

48.   On March 12, 2026, Cardiff sent NMS a written response explaining that no material breach had occurred, and Cardiff offered an open dialogue between the parties to amicably resolve the dispute and expand the parties' relationship. Cardiff's position was, and remains, that its good-faith identification of the named inventors of the Cardiff Patents does not—and cannot—constitute a breach of any rights or obligations under the License Agreement, let alone a material breach that could constitute cause for termination under Section 11.3.

**NERVIANO'S ANSWER**:  The March 12, 2026 Letter speaks for itself.  Nerviano denies the factual allegations contained therein.  The remainder of paragraph 48 contains legal conclusions that do not require a response.

49.   On March 23, 2026, the parties' respective Chief Executive Officers participated in a video conference. NMS Chief Executive Officer Hugues Dolgos indicated that NMS would set aside its inventorship claim if Cardiff offered a proposal with "value" to NMS.

**NERVIANO'S ANSWER**: Nerviano admits that on March 23, 2026, the parties' respective Chief Executive Officers participated in a video conference.  Nerviano otherwise denies the allegations of paragraph 49.

50.   However, on April 20, 2026, NMS abruptly ceased discussions and transmitted a letter to Cardiff, asserting that due to Cardiff's alleged material breach for failing to add Dr. Valsasina as a named inventor to the Cardiff Patents, NMS was purportedly terminating the License Agreement for cause under Section 11.3 of the

Case 3:26-cv-03131-RBM-JLB     Document 36     Filed 06/26/26     PageID.1221     Page 29 of 98

License Agreement, "effective immediately."

**NERVIANO'S ANSWER**: Nerviano admits that it sent a notice of termination to Cardiff on April 20, 2026 terminating the License Agreement for Cardiff's material breach of the Agreement and failure to cure within the agreed-upon time period. The April 20 Notice of Termination speaks for itself.

51. In connection with NMS's purported termination of the License Agreement, NMS demanded, among other things, that Cardiff promptly: (i) transfer to NMS all regulatory correspondences and filings for onvansertib; (ii) transfer and assign to NMS all Development Data; (iii) transfer to NMS responsibility for all ongoing clinical trials; (iv) provide an inventory and accounting of all API and transfer those materials to NMS; (v) transfer all manufacturing technology and know-how; (vi) identify all of its vendor agreements; (vii) grant a royalty-bearing exclusive license to Cardiff's patents and any Joint Patents; and (viii) transfer prosecution of any Joint Invention patent applications. NMS further demanded Cardiff immediately cease and desist its communications with FDA regarding its regulatory filings on onvansertib. In short, NMS demanded that Cardiff abruptly end Cardiff's nine-year investment in the onvansertib molecule on the basis that Cardiff and the named inventors to the Cardiff Patents did not agree that Dr. Valsasina jointly invented their patented inventions.

**NERVIANO'S ANSWER**: Nerviano admits that it sent a notice of termination to Cardiff on April 20, 2026 requesting the return of all its rights and licenses to onvansertib pursuant to Section 11.3 of the License Agreement. The April 20 Notice of Termination speaks for itself. Nerviano denies any allegations and/or legal conclusions contrary thereto.

52. On information and belief, NMS timed its purported termination of the License Agreement to follow Cardiff's recent and positive discussions with FDA and ahead of Cardiff's upcoming presentation regarding updated data from the CRDF-004 clinical trial at the 2026 American Society of Clinical Oncology (ASCO) Annual

- 28 -

Meeting scheduled for May 29-June 2, 2026, which is important to Cardiff's fundraising efforts for its upcoming Phase III clinical trials.

**NERVIANO'S ANSWER**: Denied.

53. On April 24, 2026, NMS purported to withdraw its notice of termination of the License Agreement. The parties attempted to resolve the ongoing dispute as to NMS's demands to have its employee added as a named inventor to the Cardiff Patents over the next several weeks. At NMS's repeated requests, Cardiff provided NMS with extensive data, information, and access beyond its obligations under the License Agreement. The parties were unable to amicably resolve this dispute with NMS rejecting Cardiff's proposed terms for resolution on May 14, 2026.

**NERVIANO'S ANSWER**: Nerviano admits that on April 24, 2026, at Cardiff's urgent request, it withdrew its termination on the basis of Cardiff's binding acknowledgment that it had received notice of these breaches, that the cure period had expired, and that Cardiff would not challenge the termination on grounds of failure to provide notice or adequate time to cure. Nerviano otherwise denies the allegations contained in paragraph 53.

54. On information and belief, NMS is aware of and intends for its purported and improper termination of the License Agreement to cause irreparable financial harm to Cardiff. On or about March 6, 2026, NMS claimed Cardiff was in a "precarious financial condition" because Cardiff's February 24, 2026 Form 10-K filing had disclosed that its current capital resources were only sufficient to fund operations into the first quarter of 2027. NMS subsequently asked for extensive information and to speak with Cardiff's investors and investment banks. NMS is therefore aware of Cardiff's recent fundraising efforts and the difficulty a purported termination, even if ineffective, would have on Cardiff's ability to raise capital to support its ongoing development efforts. On information and belief, NMS manufactured and timed this purported inventorship dispute to try to gain leverage over Cardiff in an improper attempt to renegotiate the terms of the License Agreement

at a crucial stage of Cardiff's work on the onvansertib product despite Cardiff's full performance under the License Agreement.

**NERVIANO'S ANSWER**: Denied.

55.    The License Agreement contains a dispute resolution term in which any dispute arising out of or relating to the Agreement may be resolved through binding arbitration before the London Court of International Arbitration ("LCIA"). Ex. A at § 13.4. The parties separately agreed, however, that this provision "shall not prevent either Party from seeking preliminary or permanent injunctive relief with respect to breaches of obligations under this Agreement in any appropriate jurisdiction." Ex. A at § 13.4(c). Here, preliminary and permanent injunctive relief are necessary to prevent irreparable harm to, inter alia, the U.S. patients currently enrolled in Cardiff's Phase II clinical trials, including some ongoing investigator initiated trials, Cardiff's ongoing work on the onvansertib product to bring a commercial product to market, and Cardiff's ability to raise capital necessary to continuing its development work.

**NERVIANO'S ANSWER**: The License Agreement speaks for itself.  Nerviano denies that absent preliminary and injunctive relief, the U.S. patients currently enrolled in Cardiff's clinical trials will suffer harm.  Nerviano lacks knowledge or information sufficient to form a belief as to the truth of the remaining matters alleged in paragraph 55, and therefore denies any and all allegations and/or legal conclusions contained therein.

56.    Cardiff has complied with and fulfilled any conditions precedent to the assertion of its claims and to its entitlement to the relief sought herein.

**NERVIANO'S ANSWER**: This paragraph contains legal conclusions that do not require a response.  To the extent any response is required, Nerviano denies those allegations.

**COUNT I:**
**Preliminary and Permanent Injunctive Relief**
**For Continued Specific Performance of License Agreement**

57.    Cardiff repeats and realleges each and every allegation contained in the

preceding paragraphs of this Complaint as if fully set forth herein.

**NERVIANO'S ANSWER**: Nerviano incorporates its responses to paragraphs 1-56 as if fully set forth herein.

58.   The License Agreement is a binding and valid contract between Cardiff and NMS, which is governed by and construed in accordance with the laws of the State of New York, without regard to the conflicts of law principles thereof. Ex. A, § 13.2.

**NERVIANO'S ANSWER**: The allegations of this paragraph purport to set forth legal conclusions to which no response is required and/or to characterize the License Agreement, which speaks for itself.  To the extent any further response is required, denied.

59.   Cardiff fully performed and continues to fully perform its obligations under the License Agreement.

**NERVIANO'S ANSWER**: Denied.

60.   NMS has purported to and continues to threaten to terminate the License Agreement effective immediately for alleged cause pursuant to Section 11.3, but the preconditions for such termination—a material breach by Cardiff that was not cured within the applicable cure period—are not satisfied.

**NERVIANO'S ANSWER**: Nerviano admits that it has terminated the License Agreement on account of Cardiff's material breaches of the Agreement and failure to cure.  Nerviano denies the remaining allegations in this paragraph.

61.   By purporting to terminate the License Agreement without a legal basis, NMS has anticipatorily repudiated and continues to threaten to repudiate the License Agreement and materially breached its contractual obligations to Cardiff, including but not limited to NMS's obligation to maintain the License Agreement in full force and effect and to permit Cardiff to exercise its exclusive license rights under Section 3.1(a), and to permit Cardiff to conduct development activities and control regulatory filings under Section 7, and to permit Cardiff to prosecute and control Cardiff's own

patents under Section 10.3.

**NERVIANO'S ANSWER**: Nerviano admits that it has terminated the License Agreement on account of Cardiff's material breaches of the Agreement and failure to cure. Nerviano denies the remaining allegations in this paragraph.

62. On information and belief, NMS has or intends to directly or indirectly initiate or conduct research, develop, and/or commercialize a Competing Product in violation of Section 3.1 of the License Agreement.

**NERVIANO'S ANSWER**: Denied.

63. Cardiff is likely to succeed on the merits of its claim that Dr. Valsasina is not a joint inventor of the Cardiff Patents, that an inventorship dispute is not a material breach of the License Agreement, and therefore NMS had no valid basis to terminate the License Agreement.

**NERVIANO'S ANSWER**: Denied.

64. As a direct and proximate result of NMS's wrongful anticipatory repudiation, Cardiff has suffered, and will continue to suffer, irreparable harm and damages, including, but not limited to:

(a) Loss of the value of Cardiff's exclusive license rights to develop, manufacture, and commercialize onvansertib in all indications throughout the world;

(b) Loss of the value of Cardiff's investment in its clinical development of onvansertib, including the costs associated with the ongoing clinical trials;

(c) Loss of capital and other investment opportunities and damage to Cardiff's relationship with investors and potential investors arising from the disruption caused by NMS's wrongful termination, which cannot be compensated by monetary damages if NMS terminates the License Agreement;

(d) Loss of the market value of Cardiff's common stock;

(e) Harm to Cardiff's reputation and standing with, among others, the FDA, clinical trial investigators, and the biopharmaceutical community;

(f) Delay of and interference with Cardiff's ability to fundraise for its Phase III clinical trials;

(g) Costs and expenses incurred in responding to NMS's wrongful demands and initiating this action; and

(h) Attorneys' fees and costs.

**NERVIANO'S ANSWER**: Nerviano denies that it anticipatorily repudiated the License Agreement.  Nerviano further denies that any harm and damages Cardiff allegedly suffers will be as a direct and proximate result of Nerviano's conduct. Nerviano lacks knowledge or information sufficient to form a belief as to the truth of the remaining matters alleged in paragraph 64, and therefore denies any and all allegations and/or legal conclusions contained therein.

65.   NMS's conduct also will result in irreparable harm to the patients engaged in Cardiff's ongoing clinical trial, including the potential loss or interruption of life-saving and/or life-extending cancer treatment.

**NERVIANO'S ANSWER**: Denied.

66.   Cardiff seeks NMS's specific performance of the License Agreement. Cardiff has performed and continues to perform its obligations under the License Agreement. Cardiff's exclusive license rights to develop and commercialize onvansertib are unique and cannot be fully compensated by monetary damages alone. Cardiff therefore requests that the Court issue an order upholding the validity of the License Agreement and requiring NMS to continue performing all of its obligations thereunder.

**NERVIANO'S ANSWER**: Nerviano denies that Cardiff has performed or continues to perform its obligations under the License Agreement.  The remainder of this paragraph contains legal conclusions that do not require a response.  To the extent any response is required, Nerviano denies those allegations.

67.   Further, the balance of the equities and hardships favors Cardiff, and the public interest will be served, if the Court issues an injunction preserving and maintaining the ongoing and current medical treatment for Cardiff's Phase II clinical-trial patients as well as investigator-initiated-trial patients. Injunctive relief will also ensure that Cardiff can continue its efforts to fundraise and receive approval to begin Phase III clinical trials and further efforts to obtain the necessary approvals to bring the onvansertib product to market for the treatment of metastatic colorectal cancer, a

disease with high unmet need with limited treatment options. By contrast, the public interest will not be harmed if NMS is required to continue performing under the License Agreement, which will preserve the status quo and permit Cardiff to continue its efforts to develop the onvansertib product to address unmet medical need.

**NERVIANO'S ANSWER**: Denied.

68. Cardiff has no adequate remedy at law. Unless NMS is enjoined from committing the unlawful acts alleged herein, including the unlawful termination of the License Agreement, Cardiff will continue to suffer irreparable harm. Accordingly, Cardiff is entitled to an injunction restraining NMS, and, as applicable, their officers, members, agents, servants, and employees, and all persons acting in concert with them, from terminating the License Agreement.

**NERVIANO'S ANSWER**: Denied.

69. The License Agreement includes indemnification obligations. Ex. A at § 12 ("Indemnification"). Cardiff has no obligation to defend, indemnify, or hold NMS harmless from and against any losses arising from or due to at least (i) NMS's breach of its obligations under the License Agreement and (ii) NMS's negligence or willful misconduct. Ex. A at § 12.2. Cardiff therefore further seeks all available monetary damages in connection with NMS's threatened and actual breaches of the License Agreement.

**NERVIANO'S ANSWER**: The License Agreement speaks for itself. This paragraph contains legal conclusions that do not require a response. To the extent any response is required, Nerviano denies those allegations.

**COUNT II:**
**Declaratory Judgment of No Breach of Contract**

70. Cardiff repeats and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

**NERVIANO'S ANSWER**: Nerviano incorporates its responses to paragraphs 1-69 as if fully set forth herein.

71. The License Agreement is a binding and valid contract between Cardiff

and NMS, which is governed by and construed in accordance with the laws of the State of New York, without regard to the conflicts of law principles thereof. Ex. A, § 13.2.

**NERVIANO'S ANSWER**: The License Agreement speaks for itself. Nerviano otherwise admits the allegations contained in paragraph 71.

72.   In view of the facts as alleged above, there is an actual, justiciable, substantial, and immediate controversy between Cardiff and NMS, having adverse legal interests, regarding whether Cardiff materially breached the Agreement and whether NMS can lawfully terminate the Agreement on the same basis.

**NERVIANO'S ANSWER**: Nerviano admits that there is an actual, justiciable controversy between Nerviano and Cardiff.  The remainder of this paragraph contains legal conclusions that do not require a response.  To the extent any response is required, Nerviano denies those allegations.

73.   A judicial declaration is necessary and appropriate so that the Parties may ascertain their respective rights, duties, and obligations under the Agreement.

**NERVIANO'S ANSWER**: This paragraph contains legal conclusions that do not require a response.  To the extent any response is required, Nerviano denies those allegations.

74.   Cardiff's primary claim is for a declaratory judgment of no breach, seeking injunctive relief that NMS honor the License Agreement. Specifically, Cardiff seeks a declaration from the Court that:

(a)   Cardiff has not breached Section 10.2(c) of the License Agreement;

(b)   Cardiff has not breached Section 10.3 of the License Agreement;

(c)   No material breach by Cardiff exists or has existed under the License Agreement;

(d)   NMS has no basis to terminate the License Agreement pursuant to Section 11.3 (or otherwise); and

(e)   NMS's April 20, 2026 purported termination is void and of no legal effect.

**NERVIANO'S ANSWER**: This paragraph contains legal conclusions that do not require a response.  To the extent any response is required, Nerviano denies those allegations.

75.    Cardiff has no adequate remedy at law. Unless the Court declares a judgment against NMS's claim that Cardiff is in breach of the License Agreement and that the License Agreement has been terminated, Cardiff will continue to suffer irreparable harm. Accordingly, Cardiff is entitled to a declaratory judgment.

**NERVIANO'S ANSWER**: This paragraph contains legal conclusions that do not require a response.  To the extent any response is required, Nerviano denies those allegations.

**COUNT III:**
**Declaratory Judgment of Inventorship**

76.    Cardiff repeats and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

**NERVIANO'S ANSWER**: Nerviano incorporates its responses to paragraphs 1-75 as if fully set forth herein

77.    In view of the facts as alleged above, there is an actual, justiciable, substantial, and immediate controversy between Cardiff and NMS regarding inventorship of the Cardiff Patents. Cardiff disputes that Dr. Valsasina is a joint inventor of U.S. Patent Nos. 12,144,813 and 12,263,173. Cardiff further disputes that (i) Cardiff's purported failure to add Dr. Valsasina as a named inventor is a material breach of the License Agreement, and (ii) NMS had a basis to unilaterally declare the License Agreement terminated as a result of Cardiff's refusal to add Dr. Valsasina as a named inventor.

**NERVIANO'S ANSWER**: This paragraph contains legal conclusions that do not require a response.  To the extent any response is required, Nerviano denies those allegations.

78.    Cardiff seeks a declaration that Dr. Barbara Valsasina is not a named inventor to the Cardiff Patents, which was a fact underlying NMS's allegations of

- 36 -

material breach and purported termination of the License Agreement.

**NERVIANO'S ANSWER**: This paragraph contains legal conclusions that do not require a response.  To the extent any response is required, Nerviano denies those allegations.

79.   NMS's letters, communications, and alleged termination of the agreement based on alleged omission of a purported joint inventor indicate that NMS will likely initiate litigation under 35 U.S.C. § 256 to determine inventorship. Accordingly, an actual and immediate controversy exists between Cardiff and NMS.

**NERVIANO'S ANSWER**: Nerviano admits that an actual and immediate controversy exists between Cardiff and NMS under 35 U.S.C. § 256.  Nerviano denies the remaining allegations contained in paragraph 79.

80.   All of the Cardiff Patent claims were conceived of and reduced to practice by Drs. Ridinger and Erlander. Accordingly, Drs. Ridinger and Erlander are the only proper inventors of the Cardiff Patents.

**NERVIANO'S ANSWER**: Denied.

81.   A judicial declaration is necessary and appropriate so that the parties may ascertain their respective rights, duties, and obligations under the License Agreement.

**NERVIANO'S ANSWER**: Admitted.

82.   Unless proper inventorship is determined and NMS is enjoined from committing the unlawful acts alleged herein, including the unlawful termination of the License Agreement predicated on alleged omission of a purported joint inventor, Cardiff and dozens of patients across the U.S. will continue to suffer irreparable harm from NMS's purported termination of the License Agreement. Accordingly, Cardiff is entitled to a declaratory judgment determining proper inventorship.

**NERVIANO'S ANSWER**: Nerviano denies that if Nerviano's rights are vindicated, the U.S. patients currently enrolled in Cardiff's clinical trials will suffer harm. Nerviano further denies that Cardiff is entitled to a declaratory judgment, injunction, or any other form of relief.  Nerviano lacks knowledge or information sufficient to

form a belief as to the truth of the remaining matters alleged in paragraph 82, and therefore denies any and all allegations and/or legal conclusions contained therein.

**COUNT IV:**
**Breach of the Implied Duty of Good Faith and Fair Dealing**

83.    Cardiff repeats and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

**NERVIANO'S ANSWER**: Nerviano incorporates its responses to paragraphs 1-82 as if fully set forth herein.

84.    The License Agreement is a binding and valid contract between Cardiff and NMS, which is governed by and construed in accordance with the laws of the State of New York, without regard to the conflicts of law principles thereof. Ex. A, § 13.2. Under New York law, a covenant of good faith and fair dealing is implied in every contract, including the License Agreement. That covenant imposes on each party to the License Agreement a duty to act in good faith and to deal fairly with the other, and prohibits any party from taking actions that would have the effect of destroying or injuring the other party's right to receive the benefits of the contract.

**NERVIANO'S ANSWER**: The License Agreement speaks for itself. Nerviano otherwise admits the allegations contained in paragraph 84.

85.    Pursuant to Section 3.1(a) of the License Agreement, NMS granted Cardiff an exclusive license to conduct research and to develop, make, have made, use, offer for sale, sell, import, and otherwise exploit the licensed intellectual property rights, including onvansertib. The central benefit of the License Agreement to Cardiff is, and at all times has been, Cardiff's ability to develop and ultimately commercialize onvansertib across all indications.

**NERVIANO'S ANSWER**: The License Agreement speaks for itself. This paragraph contains legal conclusions that do not require a response.  To the extent any response is required, Nerviano denies those allegations.

86.    Cardiff has fully performed its obligations under the License Agreement by, among other things, paying NMS the initial license fee under Section 4.1 of the

License Agreement, agreeing to pay royalties to NMS as set forth under Section 4.2 of the License Agreement, and actively engaging in development of onvansertib.

**NERVIANO'S ANSWER**: The License Agreement speaks for itself. Nerviano admits that Cardiff paid Nerviano the initial license fee pursuant to Section 4.1 of the Agreement. Nerviano denies the remaining allegations in paragraph 86.

87. NMS breached the implied covenant of good faith and fair dealing through a sustained course of bad-faith conduct designed to deprive Cardiff of the benefit of the License Agreement and to coerce Cardiff into providing NMS with economic and other concessions to which NMS was not entitled. This course of conduct is distinct from—and goes beyond—NMS's accusations of material breach wrongfully attempted and threatened purported termination of the License Agreement as alleged in Counts I-III, and includes the following:

(a)    Bad-Faith Campaign to Extract Additional Economic Value. On information and belief, NMS began a campaign in or around September 2024 to extract additional money or other value from Cardiff and the License Agreement, including through demands that Cardiff agree to extend the royalty term of the License Agreement.

(b)    Bad-Faith Demand That Cardiff Commit a Fraud on the Patent Office. NMS demanded that Cardiff confirm it would "correct the inventorship of [the '813 and '173 Patents] to add Dr. Valsasina as a joint inventor," and subsequently claimed that "Cardiff's failure to correct the inventorship of U.S. Pat. Nos. 12,144,813 and 12,263,173 to add Dr. Barbara Valsasina as a joint inventor is a material breach of, inter alia, Section 10.2(c) of the License Agreement." NMS further demanded that Cardiff make materially false representations to the United States Patent and Trademark Office regarding the inventorship of the Cardiff Patents. The implied covenant of good faith and fair dealing prohibited NMS from demanding that Cardiff engage in unlawful conduct as a purported contractual obligation.

(c)    Bad-Faith Use of Pretextual Inventorship Allegations as a Coercive Instrument. On March 23, 2026, NMS Chief Executive Officer Hugues Dolgos indicated that NMS would set aside its inventorship claim if Cardiff offered a proposal with "value" to NMS, demonstrating that NMS's purported inventorship concerns were not genuine, but were rather a pretextual instrument being deployed in bad faith to coerce Cardiff into providing NMS with additional economic and other benefits outside the negotiated terms of the License Agreement. By wielding baseless inventorship allegations as a coercive device to extract economic concessions, NMS acted in a manner wholly inconsistent with the good faith and

fair dealing obligations it owed to Cardiff.

(d)    Bad-Faith Purported Termination of the License Agreement. On April 20, 2026, NMS purportedly terminated the License Agreement for cause under Section 11.3 of the License Agreement, "effective immediately." The preconditions for such termination—a material breach by Cardiff that was not cured within the applicable cure period—are not satisfied. On information and belief, NMS's purported termination was a coercive tactic designed to deprive Cardiff of the benefit of the License Agreement in order to force Cardiff to capitulate to NMS's demands. The purported termination was therefore a bad-faith exercise of a contractual right that was unavailable to NMS under the circumstances.

(e)    Bad-Faith Exploitation of Cardiff's Alleged Financial Vulnerability. NMS claimed Cardiff was in a "precarious financial condition" because Cardiff's February 24, 2026 Form 10-K filing had disclosed that its current capital resources were only sufficient to fund operations into the first quarter of 2027, and NMS subsequently asked to speak with Cardiff's potential investors and investment banks. NMS is therefore aware of Cardiff's recent fundraising efforts and the difficulty a purported termination, even if ineffective, would have on Cardiff's ability to raise capital to support its ongoing development efforts. On information and belief, NMS manufactured and timed this purported inventorship dispute to try to gain leverage over Cardiff in an improper attempt to renegotiate the terms of the License Agreement at a crucial stage of Cardiff's work on the onvansertib product, despite Cardiff's full performance under the License Agreement. By deliberately targeting Cardiff at a moment of potential financial vulnerability and seeking to contact Cardiff's prospective investors and investment banks, NMS sought to maximize the coercive economic pressure on Cardiff in bad faith.

**NERVIANO'S ANSWER**: Denied.

88.    On information and belief, each of the foregoing acts of bad-faith conduct was designed to, and does, deprive Cardiff of the right to receive the fruits and benefits of the License Agreement, including Cardiff's ability to exercise its exclusive license rights, develop and ultimately commercialize onvansertib, maintain its regulatory relationship with the FDA, continue its clinical trials, and access the capital markets necessary to advance its clinical development program.

**NERVIANO'S ANSWER**: Denied.

89.    As a direct and proximate result of NMS's breach of the implied covenant of good faith and fair dealing, Cardiff has suffered, and will continue to suffer, significant damages, including, but not limited to:

- 40 -

(a)    Reputational harm to Cardiff and damage to its standing with clinical trial investigators and the biopharmaceutical community arising from NMS's bad-faith conduct;

(b)    Substantial disruption to Cardiff's business operations, including disruption to its ongoing clinical trials and jeopardy to the continuity of care for the cancer patients currently enrolled in those trials;

(c)    Delayed and impaired fundraising and damage to Cardiff's relationships with current and prospective investors and investment banks, arising from NMS's deliberate exploitation of Cardiff's known financial condition and its direct outreach to Cardiff's investors;

(d)    Loss of the market value of Cardiff's common stock;

(e)    Loss of the benefit of Cardiff's scheduled ASCO presentation and the fundraising opportunities arising therefrom;

(f)    Substantial expenditure of Cardiff's management time and company resources in responding to NMS's bad-faith demands and campaign;

(g)    Loss of the value of the License Agreement and Cardiff's nine-year investment in the development of onvansertib; and

(h)    Attorneys' fees, costs, and expenses incurred in responding to NMS's bad-faith conduct and initiating this action.

**NERVIANO'S ANSWER**: Nerviano denies that it breached the implied covenant of good faith and fair dealing or that any alleged damages Cardiff suffers are the direct and proximate result of Nerviano's conduct. Nerviano lacks knowledge or information sufficient to form a belief as to the truth of the remaining matters alleged in paragraph 89, and therefore denies any and all allegations and/or legal conclusions contained therein.

90.    Cardiff has been damaged as a result of NMS's breach of the implied covenant of good faith and fair dealing in an amount to be determined at trial.

**NERVIANO'S ANSWER**: Denied.

**COUNT V:**
**Intentional Interference with Prospective Economic Relations**

91.    Cardiff repeats and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

- 41 -

**NERVIANO'S ANSWER**: Nerviano incorporates its responses to paragraphs 1-90 as if fully set forth herein.

92.   Cardiff had existing and prospective business relationships and economic advantages with numerous third parties, including, but not limited to:

(a)    Current and prospective investors and investment banks from whom Cardiff has been and continues to be actively seeking to raise capital to fund its ongoing clinical development of onvansertib, including capital required for Phase III clinical trials;

(b)    The United States Food and Drug Administration, with whom Cardiff has developed an active regulatory relationship and before whom Cardiff has pending regulatory filings and ongoing communications critical to the continued development and ultimate commercialization of onvansertib; and

(c)    Clinical trial investigators and research institutions participating in Cardiff's ongoing CRDF-004 clinical trial, multiple investigator-initiated trials, and anticipated Phase III clinical trials.

**NERVIANO'S ANSWER**: Nerviano lacks knowledge or information sufficient to form a belief as to the truth of the remaining matters alleged in paragraph 92, and therefore denies any and all allegations and/or legal conclusions contained therein.

93.   NMS had actual knowledge of each of Cardiff's business relationships and prospective economic advantages described above. NMS specifically claimed that Cardiff was in a "precarious financial condition" based on Cardiff's February 24, 2026 Form 10-K filing disclosing that its current capital resources were only sufficient to fund operations into the first quarter of 2027, and subsequently sought to speak with Cardiff's prospective investors and investment banks. NMS was therefore aware of Cardiff's active fundraising efforts and the difficulty that a purported termination of the License Agreement—even if ineffective—would cause to Cardiff's ability to raise capital. On information and belief, NMS deliberately timed its purported termination of the License Agreement to follow Cardiff's recent and positive discussions with the FDA and to precede Cardiff's upcoming ASCO presentation, which is important to Cardiff's fundraising efforts for its Phase III clinical trials.

**NERVIANO'S ANSWER**: Nerviano admits that it is aware Cardiff has communicated in the past with banks, the FDA, and clinical trial investigators. Nerviano further admits that it is aware of Cardiff's current financial situation, entirely on the basis of Cardiff's own public Form 10-K filing. Nerviano lacks knowledge or information to form a belief as to Cardiff's characterization of its communications with banks, the FDA, and clinical trial investigators as "business relationships" or "economic advantages," and therefore denies any and all allegations and/or legal conclusions contained therein. Nerviano further denies the remaining allegations in paragraph 93.

94. On information and belief, NMS intentionally and wrongfully interfered with Cardiff's prospective business relationships and economic advantages through conduct that was wrongful by means beyond the fact of the interference itself, including, but not limited to:

(a) Manufacturing a false inventorship dispute as part of a campaign to extract additional money or other value from Cardiff and the License Agreement;

(b) Purporting to terminate the License Agreement effective immediately on April 20, 2026, on the purported basis that Cardiff would not agree to add Dr. Valsasina as a named inventor to the Cardiff Patents, without any lawful basis for such termination, the preconditions for cause termination under Section 11.3 of the License Agreement not having been satisfied, in a deliberate and improper attempt to gain leverage over Cardiff and coerce it into making economic concessions;

(c) Demanding, in connection with the purported termination, that Cardiff promptly: (i) transfer to NMS all regulatory correspondences and filings for onvansertib; (ii) transfer and assign to NMS all development data; (iii) transfer to NMS responsibility for all ongoing clinical trials; (iv) provide an inventory and accounting of all API and transfer those materials to NMS; (v) transfer all manufacturing technology and know-how; (vi) identify all of its vendor agreements; (vii) grant a royalty-bearing exclusive license to Cardiff's patents and any Joint Patents; (viii) transfer prosecution of any Joint Invention patent applications; and (ix) cease and desist its communications with the FDA regarding its regulatory filings on onvansertib, which threatened Cardiff's ongoing work and nine-year investment in the onvansertib product and active regulatory relationship with FDA and endangered the continuity of care for the cancer patients currently enrolled in Cardiff's ongoing clinical trials;

- 43 -

(d)     Manufacturing and timing the purported inventorship dispute, material breach, and alleged termination to gain leverage over Cardiff in an improper attempt to renegotiate the terms of the License Agreement at a crucial stage of Cardiff's work on the onvansertib product and exploiting Cardiff's ongoing fundraising efforts and dependency on the License Agreement to maximize economic pressure; and

(e)     Indicating—through NMS's CEO Hugues Dolgos during a March 23, 2026 video conference—that NMS would set aside its inventorship claim if Cardiff offered a proposal with "value" to NMS, demonstrating that NMS's purported inventorship concerns were pretextual and used as a vehicle to coerce Cardiff into providing NMS with additional economic benefits to which NMS was not entitled under the License Agreement.

**NERVIANO'S ANSWER**: Denied.

95.     On information and belief, NMS's conduct, as described herein, was intentional and was undertaken either with the sole purpose of harming Cardiff or through wrongful means that are independently tortious and improper, including but not limited to: (a) an attempted fraud on the United States Patent and Trademark Office by seeking to compel Cardiff to add a non-inventor as a named inventor on the Cardiff Patents; (b) deliberate abuse of the contractual termination provision in Section 11.3 of the License Agreement as a coercive instrument to renegotiate terms NMS believed to be economically unfavorable; and (c) targeted economic coercion of a company NMS believed to be in a vulnerable financial condition at the precise moment Cardiff needed access to capital markets and investor confidence to advance its clinical development program.

**NERVIANO'S ANSWER**: Denied.

96.     As a direct and proximate result of NMS's intentional and wrongful interference with Cardiff's business relationships and prospective economic advantages, Cardiff has suffered, and will continue to suffer, significant injury and damages, including, but not limited to:

(a)     Loss of capital and other investment opportunities and actual damage to Cardiff's relationship with investors and potential investors arising from the disruption caused by NMS's wrongful conduct;

(b)     Loss of the market value of Cardiff's common

stock;

(c)    Harm to Cardiff's reputation and standing with, among others, the FDA and clinical trial investigators;

(d)    Delay of and interference with Cardiff's ability to fundraise for its Phase III clinical trials;

(e)    Attempted disruption to Cardiff's ongoing clinical trials and jeopardy to the continuity of care for the cancer patients currently enrolled in those trials;

(f)    Loss of prospective business opportunities and economic advantages arising from Cardiff's development of onvansertib, including the value of Cardiff's anticipated commercialization of onvansertib across all indications throughout the world; and

(g)    Costs and expenses incurred in responding to NMS's wrongful conduct and initiating this action, including attorneys' fees and costs.

**NERVIANO'S ANSWER**: Nerviano denies that it interfered with any "business relationships" or "prospective economic advantages" Cardiff may have, or that any alleged damages Cardiff suffers are the direct and proximate result of Nerviano's conduct. Nerviano lacks knowledge or information sufficient to form a belief as to the truth of the remaining matters alleged in paragraph 96, and therefore denies any and all allegations and/or legal conclusions contained therein.

97.    Cardiff has been damaged as a result of NMS's tortious conduct in an amount to be determined at trial.

**NERVIANO'S ANSWER**: Denied.

## AFFIRMATIVE DEFENSES

Nerviano asserts the following defenses without assuming the burden of proof or any other burden if such burden would otherwise be on Cardiff.  Nerviano asserts these solely to the extent necessary to preserve its rights, and the factual applicability of some or all of the affirmative defenses will depend on how the claims and facts at issue in this case develop.

## FIRST AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because the Complaint  fails to allege facts sufficient to state a claim against Nerviano upon which relief may be granted on any of the claims asserted.

- 45 -

## SECOND AFFIRMATIVE DEFENSE

Plaintiff lacks standing to pursue its claims because Plaintiff cannot establish that the relief sought would likely redress the alleged injury.

## THIRD AFFIRMATIVE DEFENSE

Plaintiff is not entitled to injunctive relief because the injunction sought would not prevent, remedy, or materially alleviate the alleged injury. Any alleged harm is not caused by conduct that can be effectively addressed through the requested injunction, and Plaintiff therefore cannot establish the requisite nexus between the relief sought and the injury alleged.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part because Plaintiff is in breach of the License Agreement and is therefore estopped from asserting any cause of action against Nerviano.

## FIFTH AFFIRMATIVE DEFENSE

Nerviano has performed any and all contractual, statutory, and other duties, and Plaintiff is therefore estopped from asserting any cause of action against Nerviano.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the equitable doctrine of unclean hands and the maxim that "one who seeks equity must do equity."

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff violated the implied covenant of good faith and fair dealing inherent in any contract governed by New York law.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrines of laches, waiver and estoppel.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff has not suffered any loss, damages, or injury as a result of the conduct

by Nerviano alleged in the Complaint.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff cannot establish a causal nexus between Nerviano's actions and the Plaintiff's alleged injuries.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff voluntarily and with knowledge assumed any and all risk for alleged injuries, losses, and purported damages.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiff's alleged injuries were caused or contributed to be caused by the intervening acts, superseding negligence, and/or subsequent conduct or fault of Plaintiff or some third party.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by Plaintiff's failure to mitigate damages.

## FOURTEENTH AFFIRMATIVE DEFENSE

Any award to Plaintiff in this action would constitute unjust enrichment.

## FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff's recovery, if any, should be reduced, offset, or barred by the contributory fault, responsibility, or causation attributable to Plaintiff or some other third party other than Nerviano.

## SIXTEENTH AFFIRMATIVE DEFENSE

To the extent that the Complaint seeks punitive damages, Nerviano specifically incorporates by reference any and all standards of limitations regarding the determination and/or enforceability of punitive damages awards which arose in the decisions of *BMW of North America v. Gore*, 517 U.S. 559 (1996), *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424 (2001), *State Farm Mutual*

*Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003), and their progeny.

### SEVENTEENTH AFFIRMATIVE DEFENSE

No act or omission of Nerviano was malicious, willful, wanton, reckless, grossly negligent, or intentional, and therefore any award of punitive damages is barred.

### EIGHTEENTH AFFIRMATIVE DEFENSE

To the extent that the Complaint seeks punitive damages, Nerviano asserts that any claims for punitive damages are barred by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

### NINETEENTH AFFIRMATIVE DEFENSE

To the extent not incorporated above, Nerviano raises all affirmative defenses available under the laws of the state in which the alleged causes of action arose, as well as any and all other affirmative defenses available under the laws of other states that may apply to part or all of the Complaint or of which Nerviano become aware through discovery or other investigation as may be appropriate.

### <u>COUNTERCLAIM COMPLAINT</u>

Defendant and Counterclaim Plaintiff Nerviano Medical Sciences, S.r.l. ("Nerviano") hereby alleges Counterclaims against Plaintiff Cardiff Oncology, Inc. ("Cardiff"), as follows:

### PARTIES

1. Plaintiff Nerviano Medical Sciences S.r.l. is a società a responsabilità limitata organized under the laws of Italy, with its principal place of business at Viale Pasteur 10, 20014 Nerviano, Milan, Italy.

2. Defendant Cardiff Oncology, Inc. is a Delaware corporation with its principal place of business at 11055 Flintkote Avenue, San Diego, California 92121.

### JURISDICTION AND VENUE

3. This Court has subject-matter jurisdiction over Counts 1-3 pursuant to at least 28 U.S.C. § 1331 and 1338(a) and has subject matter jurisdiction over all claims

pursuant to § 1332(a)(2) because this action is between a citizen of a foreign state and a citizen of a U.S. State, and the amount in controversy exceeds $75,000.  This Court also has subject matter jurisdiction over Nerviano's counterclaims because Federal Rule of Civil Procedure 13(a) requires a party to assert as a counterclaim any claim against an opposing party that arises from the same transaction or occurrence as the original claim(s).

4.     Nerviano is a citizen of Italy because it is organized under the laws of Italy and has its principal place of business in Italy. To the extent its citizenship is determined by the citizenship of its members or owners, Nerviano's sole member or owner is NMS Group S.r.l., which is organized under the laws of Italy and has its principal place of business in Italy.

5.     Cardiff is a citizen of Delaware and California because it is incorporated under the laws of Delaware and has its principal place of business in San Diego, California.

6.     This Court has personal jurisdiction over Cardiff because Cardiff has its headquarters and principal place of business in this District.  Cardiff also conducts substantial business in this District and committed or directed from this District the acts and omissions giving rise to Nerviano's claims.

7.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Cardiff resides in this District.

## BACKGROUND

### A.    Nerviano, Cardiff, and Onvansertib

8.     Nerviano is an oncology-focused drug discovery and development company. It specializes in discovering and developing new cancer therapies, including small-molecule compounds designed to target the biological mechanisms involved in cancer growth and treatment resistance. Nerviano has a track-record of discovering and developing oncology therapeutics, including Rozlytrek™ (entrectinib) and Braftovi™ (encorafenib), which were licensed to and are now

- 49 -

marketed by Roche/Genentech and Pfizer, respectively, in the United States.

9. Dr. Barbara Valsasina is the Principal Scientist and former Head of Biotechnology at Nerviano. With more than thirty years' experience in the pharmaceutical industry, she is the co-author of more than forty peer-reviewed scientific papers and multiple patents. Much of her work at Nerviano has been as a Project Leader developing kinase inhibitors, from early compound discovery and validation to drug discovery and early phase clinical studies. Kinases are enzyme proteins that, if overexpressed in cells, can lead to cancer tumor growth.

10. In 2004, Nerviano undertook a program to develop Polo-like kinase ("PLK") inhibitors, with the goal of helping cancer patients. PLKs are a family of protein kinases that regulate critical stages of the cell cycle, including cell division, and DNA damage repair; the over-expression of PLKs, especially PLK1, is associated with rapid tumor growth. A drug compound that could target the over-expression of PLKs, therefore, could also be effective in inhibiting the replication of cancer cells.

11. Dr. Valsasina was heavily involved in Nerviano's PLK1-selective inhibitor development program from its beginning and, in 2005, she became PLK1 inhibitor Project Leader, leading a team of approximately fifty scientists devoted to drug discovery and development. The program led to the discovery of the compound identified as NMS-1286937 (aka NMS-P937), later identified as PCM-075 and named onvansertib.

12. This early development work was a lengthy, iterative process, enabled by Nerviano's investment in a kinase-focused platform approach. Dr. Valsasina's team began by running a high throughput biochemical screen testing Nerviano's existing library of more than forty thousand chemical compounds to determine which showed the most promising PLK1 inhibition activity. Analysis of the results allowed the selection of the most promising chemical classes to be expanded by structure-based drug design and the chemical synthesis of additional, optimized chemical compounds. These were tested in parallel not only on members of the PLK family

(looking for potent PLK1 inhibitors), but also on a panel of other protein kinases produced 'in house' at Nerviano to determine compound selectivity for PLK1, which is very important to reduce the potential for off-target binding that might lead to future safety risks for patients. The most promising compounds were then evaluated on a panel of tumor cell lines selected from Nerviano's extensive cell bank to determine the ability of each compound to kill cancer cells and to modulate PLK1-related biomarkers (readouts). Ultimately, the team designed and tested over 500 compounds at the biochemical level over the space of roughly two years.

13.    Once the most potent and selective compounds were identified, they were progressed to in vivo testing to further assess potential drug activity. Compounds were tested in tumor-bearing mice to determine their ability to reduce tumor growth. Compounds that performed well in mice were moved forward through additional toxicology testing. Testing was also conducted to ensure that the prospective drug candidates would be suitable for oral administration in order to increase future patients' convenience of use. Only the very best drug candidates were considered for testing in humans, once derisked in animal species as United States and health authorities in other jurisdictions require.

14.    Onvansertib was first synthesized after Dr. Valsasina and her team had spent roughly two years working to discover and develop an optimal PLK inhibitor drug candidate. Dr. Valsasina and her team then carried the molecule (onvansertib) through extensive preclinical testing to ensure potency and selectivity. Ultimately, the activity of onvansertib was tested in over 140 different cell lines representing a variety of different tumor types. The team also performed robust in vivo studies of onvansertib on a variety of different tumors in mice. As Project Leader, Dr. Valsasina was involved throughout this preclinical testing, overseeing the biology team, designing the studies, selecting dosages, and selecting the cell lines for use. In addition, as cancer cells are known to be able to escape single therapies and develop resistance mechanisms, Dr. Valsasina performed extensive work examining and

discovering how onvansertib could be best combined with other cancer treatments, including small molecules and therapeutic antibodies such as bevacizumab.

15.   The extensive preclinical work conducted by Dr. Valsasina and her team is reflected, in part, in multiple onvansertib patents issued to Nerviano, both in the United States and worldwide. These include, among others, the onvansertib composition of matter patent (US 8,614,220), which issued in December 2013, and a combination treatment patent (US 8,927,530), which issued in January 2015.

16.   The work of Dr. Valsasina and Nerviano did not stop at the pre-clinical stage. Based on its promising pre-clinical findings for onvansertib, Nerviano undertook to design and conduct a Phase I clinical study ("Study PLKA-937-001") to determine the maximum tolerated dose and recommended Phase II dose of onvansertib in adult patients with advanced/metastatic solid tumors.[5] The data generated by Dr. Valsasina and her team enabled Nerviano to successfully submit an Investigational New Drug ("IND") application for onvansertib to the FDA and, in May of 2009, Nerviano received FDA approval to begin its Phase I study in humans. **Exhibit 1** [May 13, 2009, Biospace PR].

17.   The Phase I study (NCT 01014429) was sponsored and run by Nerviano out of the Scottsdale Clinical Research Institute in Scottsdale, AZ, a premier clinical trial center specializing in Phase I studies. Dr. Glenn Weiss served as Principal Investigator. Details of the study are included in a confidential Study Report for Study PLKA-937-001 (version dated April 6, 2016). **Exhibit 2** [April 6, 2016, Study Report for Study PLKA-937-0001]. The Study Report was authored by Luisella Bonomini, Biol.Sc.D. (Nerviano Medical Sciences Group Clinical Leader) and lists Claudia Di Giulio, Biol.Sci.D. (Nerviano Medical Sciences Group Head of Pharmacovigilance),

---

[5] The purpose of a Phase I study is to "answer research questions related to how [the drug] works in the body, the side effects associated with increased dosage, and early information about how effective it is to determine how best to administer the drug to limit risks and maximize possible benefits. This is important to the design of Phase 2 studies."   *See*   https://www.fda.gov/patients/drug-development-process/step-3-clinical-research#Clinical_Research_Phase_Studies (last accessed June 14, 2026).

Francesco Fiorentini, Chem. Pharm. D. (Nerviano Medical Sciences Group Pharmacokineticist) and Barbara Valsasina as additional contributors. Cardiff received the Study Report for Study PLKA-937-0001, under confidentiality, before entering into the License Agreement.

18.    The first patient was enrolled in the Phase I study on December 14, 2009, and the last patient completed the study on April 12, 2012. ████

████

████

████

████

████

████

████

████

████  Patients were treated with onvansertib at the following dose levels:  6 mg/m2/day (3 patients), 12 mg/m2/day (3 patients), 24 mg/m2/day (6 patients), 36 mg/m2/day (4 patients) and 48 mg/m2/day (3 patients).    **Exhibit 2** [Study Report] at p. 63.

19.    As noted, the primary goal of the Phase I study was to determine the maximum tolerated dose and recommended Phase II dose of onvansertib in adult patients with advanced/metastatic solid tumors.  Secondary objectives of the study included documentation of antitumor activity of onvansertib in the treated patients.

20.    ████

████

████

████

████

- 53 -

21.  Data was collected throughout the Phase I study and, as the data came in, Dr. Valsasina undertook to analyze it and evaluate its clinical implications.  See **Exhibit 2** [Study Report] at p. 96. She further undertook to correlate patient response with tumor characteristics—and, in particular, genetic mutations found in collected tumor biopsies—to identify patient subpopulation(s) in which onvansertib could be most effective.  In doing so, Dr. Valsasina made several important observations. ████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████.  Importantly, Dr. Valsasina's extensive knowledge and experience gained from pre-clinical testing of onvansertib enabled her to see the significance of these observations in the broader context, despite the small sample size of the Phase I study.  Specifically, Dr. Valsasina realized that these clinical results aligned with her earlier (non-public) comparative cell-based assay data showing that onvansertib was more effective against KRAS-mutated cancer cells than non-KRAS-mutated ("wild type") cancer cells, and with her previous in vivo testing of onvansertib in mice models of KRAS-mutated colorectal tumors.  The combination of this clinical and preclinical data led Dr. Valsasina to a critical conclusion: onvansertib treatment could hold particular promise for cancer patients with KRAS-mutated tumors, and with KRAS-mutated colorectal cancer in particular.

**B.**    **Nerviano's Negotiations with Cardiff**

22.  In 2016, Nerviano entered discussions with Cardiff. These discussions led

_____

[6] The *KRAS* gene (Kirsten rat sarcoma viral oncogene homolog) provides the genetic instructions for making the K-Ras protein, which acts as an on/off switch in cell signaling.  KRAS mutations are genetic alterations in the *KRAS* gene that cause it to act like a permanent "on" switch, driving uncontrolled cell growth and cancer.  It has been estimated that the *KRAS* oncogene is mutated in approximately 35-45% of colorectal cancers.

to a meeting between the parties in December 2016, at which scientists from Nerviano provided executives at Cardiff — including Mark Erlander — with confidential presentations on multiple Nerviano-developed drug candidates. Dr. Valsasina led the presentation on NMS-P937 (now named onvansertib).

23. During the course of her presentation, Dr. Valsasina shared significant confidential, non-public onvansertib data with Cardiff and Dr. Erlander. For example, Dr. Valsasina shared her non-public comparative cell-based assay data showing that onvansertib was more effective against KRAS-mutated cancer cells than non-KRAS-mutated ("wild type") cancer cells. **Exhibit 3** [December 2016 slide presentation] at 19. Dr. Valsasina also shared the confidential clinical findings from Nerviano's Phase I study (NCT01014429) that supported the activity of onvansertib in patients with KRAS-mutated tumors, including colorectal cancer. Those findings included details of KRAS mutation profiles in the colorectal cancer patients who preferentially responded to onvansertib treatment, and correlation of tumor type and mutation profile with individual patient response. *Id*. at 14-19. (███████████████████ ██████████████████████████████████████████████████ ███████████████████████████████████).

24. Dr. Valsasina explained to Cardiff and Dr. Erlander that these data, coupled with Nerviano's previous data supporting the *in vivo* efficacy of onvansertib in animal models implanted with human colorectal tumor cells, provided a strong rationale for further preclinical and clinical testing of onvansertib in KRAS-mutated tumors and, in particular, KRAS-mutated colorectal cancer. **Exhibit 3** [December 2016 slide presentation] at 19. Accordingly, Dr. Valsasina recommended that Cardiff focus further preclinical and clinical investigation of onvansertib in the population of patients with KRAS-mutated colorectal cancer.

25. Following the December 2016 presentation, and sharing of further information with Cardiff such as the Investigators Brochure from Nerviano's Phase I study via a virtual data room, which, again, had included multiple drug development

candidates, Cardiff elected to license onvansertib for further clinical development. Cardiff later adopted Dr. Valsasina's recommendation and contribution, and proceeded to pursue a Phase 1b/2 study of onvansertib in combination with standard of care in patients with KRAS-mutated colorectal cancer. The KRAS-mutated metastatic colorectal cancer patient population became the basis for Cardiff's clinical trials, including this study (NCT03829410) and subsequent NCT04446793.

**C.      The License Agreement**

26.    Nerviano and Cardiff entered into the License Agreement on March 13, 2017.  **Exhibit 4** [License Agreement].

27.    Under the License Agreement, Nerviano granted Cardiff an exclusive license, to research, develop, and commercialize the onvansertib compound.  *See* **Exhibit 4** [License Agreement] §§ 3.1(a), 3.2; *see also* § 1.20, 1.24–25, 1.32, 1.4 & Ex. 1.4. To that end, Nerviano provided Cardiff with all information related to the "Licensed IP Rights" (*i.e.*, the compound), including PLK1-related assays, know-how concerning the manufacture or use of the compound, regulatory submissions and communications, trial master files, Investigators Brochure, clinical-trial results, and other treatment-related reports.  *See id.* § 3.4. It also transferred product registrations to Cardiff and gave Cardiff rights to reference, use, and access regulatory documents relating to the Licensed IP Rights or API.  *Id.* §§ 3.4, 3.5.

28.    Cardiff, for its part, agreed to undertake ongoing obligations to develop and seek regulatory approval for onvansertib, to keep Nerviano informed throughout the development-governance process, and to make required milestone and royalty payments, among other things. *See id.* §§ 4.2, 4.3.1–4.3.3, 7.1(a), 7.1(c)–(d), 7.2, 7.6, 7.3, 7.5, 7.9.

29.    Relevant here, the License Agreement also established rules governing ownership of inventions made during the parties' contractual relationship and rules for prosecution of the related patent rights. Under Section 10.2, inventions made solely by Nerviano personnel or others acting on its behalf belonged to Nerviano,

while inventions made solely by Cardiff personnel or others acting on its behalf belonged to Cardiff. § 10.2(a)-(b). Section 10.2 also addressed "Joint Inventions"— inventions for which, under United States patent law, at least one person acting on behalf of Nerviano and at least one person acting on behalf of Cardiff were joint inventors. The parties jointly own Joint Inventions and the patent rights covering them. *See id.* § 10.2(c).

30.    For Joint Inventions, Cardiff was responsible for filing patent applications and directing patent prosecution at its own cost and expense, though all patent applications and patents directed to such inventions are jointly owned by both parties. *See id.* § 10.3(b). If, however, Cardiff did not pursue patent protection for Joint Inventions—that is, it elected not to file, prosecute, or maintain patent applications or patents directed to Joint Inventions, or failed to protect and maintain them after notice—Section 10.3(b) gave Nerviano the right, at its own expense and in its sole discretion, to file, prosecute and maintain those patents. *See id.* § 10.3(b).

31.    Furthermore, the License Agreement obligated Cardiff to use Commercially Reasonable Efforts to achieve certain objectives with respect to onvansertib. Under Section 1.6, Commercially Reasonable Efforts "means, as applied to [Cardiff], its Affiliate or a Sublicensee, those efforts and resources that a company within the bio-pharmaceutical industry at a similar stage of development as [Cardiff], such Affiliate or such Sub licensee, as applicable, would use for a compound or product with similar market and/or commercialization prospects at a similar stage in its product life cycle, taking into account the stage of development or commercialization of the compound or product, the cost-effectiveness of efforts or resources, the competitiveness of alternative compounds or products that are or are expected to be in the marketplace, the patent and other proprietary position of the compound or product, the profitability of the compound or product."

32.    For example, under Section 7.3 (Development Activities), Cardiff was obligated to use Commercially Reasonable Efforts to conduct all additional

development necessary for Regulatory Approval of onvansertib in the Major Market Countries (defined under Section 1.21 as ███████████ and any one of the following ███████████ as determined by Cardiff in its sole discretion: ███████████████████████████, as well as any of ███████████).

33.    Under Section 7.5 (Regulatory Approvals), Cardiff was obligated to use Commercially Reasonable Efforts to (a) obtain Regulatory Approvals for the onvansertib in accordance with the parties' Development Plan; (b) compile, submit and prosecute in a timely manner all necessary data, documents, NDAs (including labeling), in a format acceptable to the applicable Regulatory Authorities, and (c) maintain and renew the Regulatory Approvals obtained by Cardiff and hold all such filings and approvals in its name.

34.    Under Section 7.9 (Development Diligence), Cardiff was obligated to use Commercially Reasonable Efforts to conduct the development activities with respect to onvansertib and to use Commercially Reasonable Efforts to conduct Initial Clinical Studies.

35.    As the mechanism to require Cardiff to try to turn onvansertib and the Licensed IP into a commercial Product rather than merely hold rights, these efforts obligations were critical to Nerviano. Indeed, the company's expected return on the license depended on back-end Development, Commercial and Annual Net Sales Milestones, as well as Royalties on Annual Net Sales.

36.    The Development Milestones and associated Milestone Payments in the License agreement were as follows:

| Milestone Event | Payment |
|---|---|
| Dosing of the first subject in the first Phase III Clinical Trial for the first Product or after completion of a Phase II Clinical Trial that is used as the basis for an NDA submission. | $███████ |
| Upon filing of the first NDA or equivalent for the first Product. | $███████ |

37.    The Commercial Milestones and associated Milestone Payments in the

- 58 -

| Milestone Event | Payment |
|---|---|
| First Commercial Sale in any ██████ ██████ for the first Product | $████████ |
| First Commercial Sale in ██████████ (whichever is first) for the first Product | $████████ |
| First Commercial Sale in the USA for the first Product | $████████ |

License agreement were as follows:

38.   The Annual Net Sales Milestones and associated Milestone Payments in the License agreement were as follows:

| Milestone Event | Payment |
|---|---|
| Annual Net Sales of $████████ | $████████ |
| Annual Net Sales of $████████ | $████████ |

39.   In addition, Cardiff was to pay Royalties to Nerviano in accordance with Section 4.2 of the License Agreement, which provided as follows:

> During the applicable Royalty Term for a Product, on a Product-by-Product and country by country basis, subject to the terms and conditions of this Agreement, with respect to aggregate Annual Net Sales in the Territory by [Cardiff] and its Affiliates and Sublicensees, [Cardiff] shall pay to Nerviano Royalties equal to, for Annual Net Sales of such Product in countries where the sale of such Product is covered by a Valid Claim in such country, then:
> (a) ████ percent (██%) of the first ████████████████ United States Dollars (US $████████) of such Annual Net Sales,
> (b) ████ percent (█%) of such Annual Net Sales in excess of ████ ████████ ████████ United States Dollars (US $500,000,000) but less than ████████ United States Dollars (US $████████████) and
> (c) ████ percent (██%) of such Annual Net Sales in excess of ████████ United States Dollars (US $████████████).

40.   The License Agreement expressly contemplated that Nerviano and Cardiff would create a Joint Development Committee ("JDC") to "exchange

- 59 -

information regarding all activities related to the Development of the Product [onvansertib]" from the signing until the first regulatory approval for onvansertib. § 7.1(a). The JDC was to consist of four individuals, two designated by Nerviano and two designated by Cardiff. § 7.1(b). The License Agreement required the JDC to "endeavor to work by consensus," but where consensus could not be reached, Cardiff could make "the final determination after consultation with Nerviano and considering Nerviano's position in good faith," provided that Cardiff's "final determination" did not "conflict[] with the terms and conditions of [the License Agreement]." *Id*.

41.    The License Agreement also provides for early Termination for Cause: "Upon the material breach by one party under this Agreement, the other Party shall notify the breaching Party of such breach, and require that the breaching Party cure such breach within sixty (60) days….In the event that the  material breach is not cured within the applicable cure period, the notifying Party shall be entitled, without prejudice to any of its other rights conferred on it by this Agreement and any other remedies available to it by law or in equity, to terminate this Agreement." § 11.3.

42.    Upon termination by Nerviano pursuant to Section 11.3, the Agreement provides that Cardiff must comply with the post-termination obligations of § 11.4(b), including:

> ….(ii) All rights and licenses granted by Nerviano to [Cardiff] will terminate.
> (iii) Provided that as of the date of termination, no Sublicense exists, [Cardiff] will assign to Nerviano all regulatory filings and Regulatory Approvals for the Product and the Development Data;
>
> (iv) If termination occurs after submission of materials seeking Regulatory Approvals for the Product, and provided that as of the date of termination, no Sublicense exists, all rights to all Product Trademarks for use with the Product (excluding [Cardiff's] name) will be assigned to Nerviano;
> (v) [Cardiff] will, at Nerviano's option, and provided that as of the date of termination, no Sublicense exists, transfer to

Nerviano responsibility for any then-ongoing clinical trials of Products in which patient dosing has commenced, and Nerviano shall be solely responsible for the costs of conducting such trials incurred after the effective date of termination of this Agreement;

(vi) [Cardiff] shall, provided that as of the date of termination, no Sublicense exists, grant to Nerviano a royalty bearing, exclusive license (with right to sublicense) under the Joint Inventions, [Cardiff] Patents and [Cardiff] Know-How existing as of the date of termination solely for the API or its manufacture or use in any indication (and no other active pharmaceutical ingredient or diagnostic).

….

(viii) Provided that as of the date of termination, no Sublicense exists, [Cardiff] will cooperate in any reasonable manner requested by Nerviano to achieve a smooth transition of the development, manufacturing, marketing and sales of the Product to Nerviano or its licensees, such as transfer of Manufacturing Technology and assistance in connection with regulatory matters relating to the transfer of the Product.

43.    The License Agreement is "governed by and construed in accordance with the laws of the State of New York (USA), without regard to the conflicts of law principles thereof." *See id.* § 13.2.

### D.    Dr. Valsasina's Continued Contributions to Conception and the Patents At Issue

44.    Dr. Valsasina's contributions did not end as of the license date. Instead, Cardiff and Dr. Erlander continued to rely on Dr. Valsasina to contribute her scientific knowledge and confidential data throughout the design and conduct of Cardiff's Phase 1b/2 study. Indeed, by early 2019, Cardiff had registered a Phase 1b/2 trial called TROV-054 (NCT03829410) to test onvansertib in combination with standard of care in metastatic colorectal cancer ("mCRC") patients with a KRAS mutation – what Dr. Valsasina had suggested to Cardiff and Dr. Erlander. Even after the design and registration of the Phase 1b/2 study, Dr. Valsasina continued to collaborate with

- 61 -

and support Cardiff's clinical development.  *See, e.g.,* **Exhibit 6**  [██████████ ████████████████████████████████████████████████████████████████ ████████████████████████]; **Exhibit 7**  [████████████████████████ ████████████████████████████████████████████████████████████████████████]; **Exhibit 8**  [████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████]; **Exhibit 9**  [████████████████████████████████████████████████████ ████████████████████████████████████████]; **Exhibit 10**  [████████████ ████████████████████████████████████████████████████████████]; *see also* **Exhibit 5**  [████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████].

45.    Moreover, Dr. Erlander explicitly acknowledged that he needed Dr. Valsasina's input because she had knowledge and confidential information that was not available in the literature. ████████████████████████████████████████ ██████████████████████████████████████:

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████   ████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████.

**Exhibit 6**. Dr. Valsasina promptly provided the requested information. *Id.*

46.    Similarly, in ██████████████████████████████████████████ ██████████████████████████:

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████

Again, Dr. Valsasina promptly responded, directing Dr. Erlander to the requested confidential information. *Id.*

47.    At the time of these communications, Cardiff recognized the value of Dr. Valsasina's continued involvement and support while Cardiff designed its Phase Ib/2 clinical trial to select and treat the patient population that Dr. Valsasina had identified and recommended to it. **Exhibit 7** [████████████████████████████████████████████████████████████████████████]; **Exhibit 9** [████████████████████████████████████████████████]; **Exhibit 8** [████████████████████████████████████████████████████████]; **Exhibit 10** [████████████████████████████████████]; **Exhibit 10** [████████████████████████████████████████████████].

48.    Cardiff's Complaint touts Cardiff's alleged development efforts and characterizes Cardiff as "a clinical-stage biotechnology company focused on leveraging PLK1 inhibition." (D.N. 1 at ¶16). What Cardiff neglects to mention is that, before licensing onvansertib from Nerviano in 2017, Cardiff (then Trovagene) was a diagnostics company. *Compare* **Exhibit 11** [Trovagene 10-K for the fiscal year ended December 31, 2016] ("We are a life science company that focuses on the development and commercialization of a proprietary molecular genetic detection technology for use in pharmaceutical development, clinical research and medical testing across a variety of clinical disciplines, including oncology and virology.") *with*

**Exhibit 12** [Trovagene 10-K for the fiscal year ended December 31, 2017] ("We are a clinical-stage, precision medicine oncology therapeutics company….Our lead drug candidate, PCM-075 [onvansertib], is a Polo-like Kinase 1 ("PLK1") selective adenosine triphosphate ("ATP") competitive inhibitor."); *see also* **Exhibit 32** [Trovagene S-1 dated 10-25-2017] at 12 ("***We have limited experience in the development of therapeutic product candidates and therefore may encounter difficulties developing our product candidate or managing our operations in the future.***") (emphasis in original).

49. The factual record flatly contradicts Cardiff's allegation that Dr. Valsasina had no involvement with Cardiff or Dr. Elander following her original presentation in 2016. Rather, Cardiff's efforts to "leverage PLK1 inhibition" by further developing onvansertib are built on the back of Nerviano's and Dr. Barbara Valsasina's extensive pre-license work—discovering the molecule, and bringing it through not only pre-clinical testing but also IND submission, first-in-human phase I clinical testing, and identification of the recommended phase 2 starting dose and patient population (patients with KRAS mutated tumors such as colorectal cancer) – and further assisted by Dr. Valsasina's contributions years after the License Agreement was executed and even after the Phase 1b/2 clinical trial TROV-054 (NCT03829410) was designed and registered.

50. Based on initial results from Phase 1b/2 study (called TROV-054, NCT03829410), Cardiff filed a provisional patent application (U.S.S.N. 63/405,466) on September 11, 2022. Cardiff filed a second provisional application (U.S.S.N. 63/515,831) on July 26, 2023.[7] On September 11, 2023, Cardiff filed a utility application – PCT/US2023/073865 – claiming priority to the two provisionals, which international application was first published on March 14, 2024 as WO2024/055039. The issued patents and pending applications that are at issue in this dispute claim

---

[7] Provisional patent applications are not made public unless a utility patent application claiming the benefit of the provisional application is filed and itself published, usually 18 months after the priority filing date.

priority to PCT/US2023/073865 and share a common disclosure (or "specification") with PCT/US2023/073865. A true and correct copy of the publication of PCT/US2023/073865 is attached hereto as **Exhibit 13**.

51. PCT/US2023/073865 contains a written disclosure comprising three examples. Example 1 is titled "Clinical Trial of Onvansertib in Combination with Bevacizumab" and it "describes the results (as of Jul. 25, 2022) of a Phase 1b/2 clinical trial (NCT03829410) for determining the safety and efficacy of onvansertib in combination with FOLFIRI and bevacizumab (which is the current standard of care for the second line treatment of patients whose disease has relapsed or progressed following first line treatment with oxaliplatin and fluoropyrimidine)." **Exhibit 13**, ¶[0153]. The Phase 2 portion of the trial included three efficacy endpoints: "(1) the primary efficacy endpoint: the objective response rate (or ORR); (2) secondary endpoints: other measures of disease response, including progression free survival and duration of response; and (3) for one of the exploratory endpoints, the correlation between changes in the KRAS mutation burden in circulating tumor DNA and radiographic disease response." **Exhibit 13**, ¶[0154]. A total of 50 patients were enrolled in the Phase 1b/2 trial; 35 of those 50 patients had previously been treated with bevacizumab. **Exhibit 13**, Tables 1 and 2. In other words, most (>2/3) of the subjects in the study were *not* "bevacizumab naïve." Even so, the patent reports a "strong, durable response" across the study population at all doses, including at the recommended Phase 2 dose. **Exhibit 13**, Table 3. More specifically, across the study population, 34% of study subjects showed an objective response rate and 94% of study subjects showed a disease control rate. *Id*.

52. Notably, Cardiff sought and obtained patent protection directed to methods of treating with onvansertib that same patient population tested in the Phase 1b/2 study. More specifically, Claims 1-16 of U.S. Patent No. 12,144,813 (**Exhibit 14**) and Claims 2, 11, and 20 of U.S. Patent No. 12,263,173 (**Exhibit 15**) are directed to methods of treating KRAS-mutated metastatic colorectal cancer. Likewise,

pending patent applications U.S.S.N. 19/94472 and U.S.S.N. 19/412,419, each of which claims priority to PCT/US23/73865, contain claims that are directed to methods of treating or methods of selecting for treatment patients with KRAS-mutated metastatic colorectal cancer. Dr. Valsasina contributed in a significant manner to the conception of the treatment methods disclosed and claimed in each of these issued and pending patents. Yet, Cardiff nonetheless refuses to identify Dr. Valsasina as a joint inventor on any of them.

### E.      Cardiff's Mismanaged Development of Onvansertib

53.     When the parties signed the License Agreement in March 2017, onvansertib was at the end of Phase 1 clinical development. Initially, the development timeline for onvansertib comported with industry standards for oncology drug development, with Cardiff estimating a 2022 approval of onvansertib in colorectal cancer. Indeed, other colorectal cancer drugs on the market were approved between three and ten years after the *first* clinical study was initiated.

54.     But Cardiff's ███████████████ has caused ███████████████ ███████████, despite Nerviano's repeated objections. The consequences are significant. Onvansertib was originally positioned to be the first highly selective PLK1 inhibitor to enter the market for treatment of patients. Nine years later, it remains at the Phase 2a/b stage, with a ███████████████████████ ████████████████████████████████████████ ████████████████ in metastatic colorectal cancer ("mCRC").

55.     Indeed, Cardiff has ████████████████████████ ████████████. For example, Cardiff's Type B meeting with the FDA, ████████ ████████████████████████, did not occur until April 2026. At a JDC meeting on August 2, 2023, Cardiff announced that ████████████████████████ ████████████. Cardiff's current estimate has slipped to November 2026. At a JDC meeting on June 2, 2024, Cardiff informed Nerviano that its expected dates for Accelerated and Full Approval of onvansertib were ████████████████

respectively, but by the JDC meeting on June 12, 2025, only a year later, ███████ ████████████████████████████████████████████████████. And when Nerviano challenged Cardiff's repeated delays and requested an explanation, Cardiff refused to provide satisfactory answers. At the final JDC meeting on December 18, 2025, Cardiff removed prospective deadlines for Accelerated Approval and Full Approval of onvansertib from its briefing materials altogether and refused to provide Nerviano with a timeline or an explanation.

56.   In addition to commercially unreasonable delays to the program, more recent events beginning in 2025 have caused irreversible damage to Nerviano's ability to receive the benefit of its bargain in the form of Milestone Payments and Royalties. Beginning in August 2023, Cardiff commenced CRDF-0004, a randomized Phase 2 study of onvansertib in first-line patients with KRAS-mutated mCRC. The purpose of the study was to determine the optimal dose of onvansertib with standard of care ("SoC") and to support the design of a Phase 3 registrational study. For most patients with mCRC, the SoC includes a chemotherapy (commonly FOLFOX or FOLFIRI) together with bevacizumab (Avastin). CRDF-0004 therefore included six randomization arms:  (1) FOLFIRI and bevacizumab alone, (2) FOLFOX and bevacizumab alone, (3) 20mg onvansertib plus FOLFIRI and bevacizumab, (4) 20mg onvansertib plus FOLFOX and bevacizumab, (5) 30mg onvansertib plus FOLFIRI and bevacizumab, (6) 30mg onvansertib plus FOLFOX and bevacizumab. The primary endpoint of the study was objective response rate ("ORR"), with duration of response ("DoR") and progression free survival ("PFS") as secondary endpoints, all to be assessed by blinded independent central review ("BICR").

57.   When it began the CRDF-0004 study, Cardiff informed Nerviano that ███ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████. Nerviano warned Cardiff of significant risks associated with this plan. ████████████████████ ████████████████████████████████████████████████████████████

- 67 -

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████. Despite Nerviano's expressed concerns about the associated risks, Cardiff proceeded with its original plan.

58. In July 2025, Cardiff began to review and share with the JDC preliminary data from CRDF-0004. This early look at the data showed that there ████ ████████████████████████████████████████████████████████. Nerviano told Cardiff that it appeared that the ███████████████████ ██████████████████████. While Cardiff disagreed with Nerviano's assessment that ██████████████████████████████, Cardiff should have been concerned by at least the middle of 2025 that ███████████████████ █████████████████████████████████████████████████ ██████████████████████████████████████████. The reasonably prudent action for a company in Cardiff's position to undertake by at least July 2025 was to ██████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ███████.

59. By November 2025, the CRDF-0004 data confirmed that ███████████ ██████████████████████████████████████████ ██████. With respect to the FOLFIRI arms, █████████████████████ ██████████████████████████████████████████ ██████████████████████████████. Unsurprisingly, the █████████ █████████████████████████████████████████████ █ ██████████████████████████████████████████ ██████████████████████████. In short, the data set from CRDF-0004 was ██████████████████████████████████.

- 68 -

60. Based on the data available, at the December 2025 JDC, Nerviano recommended ██████████████████████████████████████████████████████████████████████████████████████████████████████████. Nerviano's proposal was driven in part by FDA's "Project Optimus," an initiative launched in 2021 by the FDA Oncology Center of Excellence to reform how cancer drugs are dosed during development. Historically, oncology drug developers often followed a development paradigm inherited from cytotoxic chemotherapy: find the maximum tolerated dose and use that dose in later trials. Project Optimus challenged that approach, particularly for modern targeted therapies. The FDA's position was and remains that the highest tolerable dose is not necessarily the dose that provides the best balance of efficacy and safety. As a result of Project Optimus, FDA expects sponsors to evaluate multiple doses earlier in development, characterize dose-response relationships, characterize exposure-response relationships, understand how efficacy changes across doses, understand how toxicity changes across doses, and elect an "optimized" dose rather than simply the highest tolerable dose. In practical terms, FDA wants robust dose-finding work before pivotal studies begin.

61. Rather than ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ This choice by Cardiff constituted a breach by Cardiff of its various obligations to use Commercially Reasonable Efforts as required in the License Agreement because no company within the bio-pharmaceutical industry with a drug at a similar stage of development and with similar market and/or commercialization prospects as onvansertib would have ████████████████████████████████████████████████████████████████████████████████████.

62. In April 2026, Cardiff had a Type B End-of-Phase 2 ("EOP2") meeting

- 69 -

with the FDA. This is one of the most important regulatory meetings during development because it occurs after Phase 2 clinical trials and before a sponsor commits to Phase 3 registrational studies. The purpose of an EOP2 meeting is to review Phase 1 and Phase 2 safety and efficacy data, discuss whether it is appropriate to proceed to Phase 3, obtain FDA feedback on the proposed Phase 3 trial design, including the selected dose, endpoints, statistical plan, and patient population, and identify any additional studies or information needed to support a future FDA submission.

63. Not only did Cardiff ████████████████████████████████████, but the company made significant mistakes in connection with its presentation of data to the FDA for the EOP2 meeting – ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████.



64. FDA's feedback was ███████ ████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████

- ████████████████████████████████
  █ ███████ ███████ ██████████ █████████ ███████ ██████
  ████████████████████████████████████
  ███████████████
  █ ████████████████████████████████
  ████████████
  █ ████████████████████████

65. Following the meeting, ████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████ .

66.   Now, Phase 3 is not only delayed, it has been made ████████████ ████ due to Cardiff's commercially unreasonable actions that have led directly to ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████████. In short, Cardiff's commercially unreasonable handling of the development program, including its choice to ████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████████.

67.   Cardiff's plans for continued development do nothing to mitigate that risk. In fact, Cardiff's path forward ████████████████████████████████. A company in the bio-pharmaceutical industry with a product at a similar stage of development as onvansertib would ██████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████.

68.   Rather than proceed in this manner, Cardiff instead intends to proceed in a manner that again breaches its obligation to use Commercially Reasonable Efforts. Cardiff plans to commence a Phase 3 study, but only after it ████████████████ ██████████████████████████████████████████. Further, Cardiff's design for the Phase 3 study does not comply with its Commercially Reasonable Efforts obligations. Cardiff has chosen to ████████████████████████████████████ ██████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████. Cardiff's plan to ██████████████████████ is not only commercially unreasonable, but also will ████████████████████████████ ████████████████████████████████. Additionally, █████████████ ███████████████████████████████████████████████████ ████████████████████████████.

69. In addition to mismanaging the clinical development program, Cardiff's regulatory strategy did not comport with its Commercially Reasonable Efforts obligation. Under Section 7.3 of the License Agreement, Cardiff was required to use Commercially Reasonable Efforts to conduct development necessary for ████████ ███████████████████████████████████████████████████ ████████████████. On information and belief, Cardiff has taken no serious steps to ████████████████████████████████████.

70. In fact, in its most recent Development Plan, dated January 2025, Cardiff stated that ████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████ In other words as of January 2025, nearly eight years after signing the License Agreement, Cardiff had paid no more than lip service to ████████████████████████.

71. In what appears to be a tacit admission of Cardiff's commercially unreasonable approach to the development of onvansertib, Cardiff's Board of

Directors ███████████████████████████████████████ ███ and they stepped down from the Board shortly thereafter. *See* **Exhibit 26** [01/27/2026 Cardiff Press Release]. ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

F. **Nerviano's Communications with Cardiff Regarding its Lack of Commercially Reasonable Efforts**

72.  Beginning at least by December 18, 2024, NMS raised with Cardiff its concerns regarding Cardiff's development efforts, including that ███████████████ ████████████████████████████████████████████████ **Exhibit 16** [12/18/2024 H. Dolgos letter to M. Erlander]. Based on unsatisfactory responses, including Cardiff's failure to ████████████████████████████████ ████████████, along with no ████████████████████████████████, and an ██████████████████████████████████ without any justification, NMS provided Cardiff with notice that Cardiff was "failing to use Commercially Reasonable Efforts as required by §§ 7.3, 7.5, and 7.9 of the Agreement. **Exhibit 17** [2/28/2025 H. Dolgos letter to M. Erlander]. NMS tried to engage with Cardiff to reach alignment on a development plan for onvansertib, but Cardiff's failure to share information or report on even the most basic development information at meetings of the Joint Development Committee ("JDC") obstructed any resolution on these issues. NMS raised these significant governance issues with Cardiff throughout the Fall of 2025 both in conversations and written communications. In October, NMS wrote to Cardiff again identifying Cardiff's failure to abide by the joint development provisions of the Agreement, including its failure to keep Nerviano informed about development efforts through the JDC so that Nerviano could exercise its contractual right to consult and provide comments on Cardiff's development plan. **Exhibit 18** [10/5/2025 A. Valenti e-mail to B. Graveline].

73.  These missteps and failures culminated in January 2026, with Cardiff's

CEO, Mark Erlander, and CFO, James Levine, stepping down with no ready replacements – a tacit acknowledgement that they had mismanaged the development of onvansertib. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

74. In March 2026, a member of Cardiff's Board of Directors, Mani Mohindru, was appointed interim, and then permanent, CEO. Nerviano was cautiously optimistic that Dr. Mohindru's appointment would lead to greater responsibility and transparency. But Cardiff has continued to refuse to ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

G. ████████████████████████████████████

75. According to the American Cancer Society, colorectal cancer is the third most common cancer worldwide, with 150,000 new cases and 55,000 deaths annually in the U.S. alone. The U.S. Centers for Disease Control and Prevention ("CDC") data shows that of the 150,000 newly diagnosed colorectal cancer patients in the US, 20% present with metastatic disease.

76. Cardiff has stated as recently as February 2026 that onvansertib has "blockbuster potential" and can capture 50% of the first-line mCRC market.

77. Despite that potential, Nerviano will not receive any bargained for Royalties due to Cardiff's lack of Commercially Reasonable Efforts. Royalties in the Agreement are tied to the existence of a Valid Claim. Here, the foundational patents protecting the composition of matter will expire in 2030. Therefore, Nerviano will not be paid Royalties under the License Agreement if Cardiff files a New Drug Application after 2030. In Cardiff's May 2026 clinical development plan, Cardiff estimated filing an NDA in ███████████, thereby depriving Nerviano entirely of any

Royalties, which loss Nerviano estimates of at least $█████████

78.    Cardiff's mismanagement and resulting delay has also delayed and will deprive Nerviano the opportunity to receive certain Milestone Payments. In the nine years since the License Agreement was signed, Nerviano has received only an upfront payment of $2 million.  No other Milestones have been triggered. Had Cardiff's timelines been in line with typical timelines in the industry, Cardiff would have already achieved the first Milestone, and likely others as well.

79.    Additionally, there are two milestones in the License Agreement that are tied to "Annual Net Sales."  The first is a $████████ Milestone Payment payable ████████████████████████████████████████████████████████████ The second is a $████████ Milestone Payment payable "█████████████████████████ ████████████████████████████████████ Cardiff's unreasonable development delays, which have resulted in launch delays, will allow other competitors to enter the mCRC market (*e.g.*, Summit Therapeutics' ivonescimab) and thereby reduce or eliminate onvansertib's "blockbuster potential."

### H.    Cardiff's Failure to Pursue Joint Invention IP or to Give Meaning to Nerviano's Right to Pursue Such IP

80.    Cardiff's disregard for Nerviano's rights did not stop with its failure to properly name a Nerviano inventor on Joint Invention IP. Cardiff also obstructed Nerviano's right to pursue such IP protection. Nerviano believed that the same patent family that includes the '813 and '173 Patents supported broader claims. Specifically, Nerviano believed that Cardiff should pursue a continuation patent application directed to methods of treating KRAS-mutated mCRC patients with the claimed therapeutic combination including onvansertib without limiting the patient population to bevacizumab-naïve patients. That broader filing would be logical because the clinical study data disclosed in Cardiff's patent application was not limited to bevacizumab-naïve patients. Indeed, as discussed *infra*, the majority of subjects in the clinical trial disclosed in the patent application had previously received bevacizumab and even so, showed positive effects.

81. In its December 18, 2025 letter, Nerviano wrote to Cardiff and requested that Cardiff file a Joint Invention continuation patent application claiming priority to PCT/US2023/073865 – the same priority patent application to which the '813 Patent and '173 Patents claim priority. More specifically, ███████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████     ████████

████████████████████████████████. This proposed joint invention patent application is important because Cardiff does not yet know what onvansertib's eventual FDA labeling will look like and it should take reasonable steps to make sure that ██████████████████████████████████.

82. In response, Cardiff took the position that it was not required ████████

██████████████████████████████████████████████

███████████████████████████████████. **Exhibit 20** [████████

██████████████████████].

83. On February 9, Nerviano again reiterated its request that Cardiff file a joint invention continuation patent application on ████████████████████

██████████████████████████████████████████████

██████████████████████████. **Exhibit 21** [████████████████

████████]. Nerviano also enclosed with its letter a joint invention continuation application claiming priority to PCT/US2023/073865 and that contains claims directed to ████████ ██ ████████████ ██████ ██████ ████ ████████

██████████████████████████████████████████████

████████████████████. Because, as discussed above, Dr. Valsasina contributed to the

- 76 -

conception of methods for treating KRAS-mutated mCRC patients with onvansertib, the proposed continuation application is a Joint IP patent application. Pursuant to Section 10.3 of the License Agreement, Nerviano requested that Cardiff either file the enclosed Joint IP continuation patent application or, alternatively, Nerviano requested that Cardiff execute a power of attorney that would allow Nerviano to pursue such application. Cardiff did neither.

84.    Under § 10.3(b) of the License Agreement, Cardiff has the first right to file any patent application on a joint invention. However, if Cardiff decides not to file a patent application on a Joint Invention, "Nerviano shall then have the right, at its sole expense and in its sole discretion, to file such applications." Therefore, once Cardiff declined to file the joint IP continuation application, the License Agreement provided Nerviano with the contractual right to do so.

85.    Cardiff's suggestion that Nerviano could file this continuation application on its own is disingenuous. In order for Nerviano to file the new continuation application and claim priority to PCT/US2023/073865, it requires a Power of Attorney (or someone with a Power of Attorney) in the existing family to file the new continuation application.  If, instead, Nerviano filed it as a new patent application and did not claim priority to PCT/US2023/073865, all of the disclosure of PCT/US2023/073865 – including Nerviano's inventive contributions – would be prior art against the new patent application and would prevent allowance of the proposed claims. By refusing to either file the joint IP continuation application or granting Nerviano a power of attorney to make the filing itself, claiming priority to PCT/US2023/073865, Cardiff breached and obstructed Nerviano's contractual right to file the joint invention patent application.

I.    **Nerviano's Efforts to Raise and Resolve the Parties' Disputes**

86.    By at least June of 2025, Nerviano advised Cardiff that NMS inventors should have been added to the patents and pending applications in the PCT/US2023/073865 patent family.  **Exhibit 22** [6/25/2025 A. Valenti e-mail to B.

Graveline]. Nerviano specifically identified Dr. Barbara Valsasina, a Nerviano employee, as a misjoined inventor and provided examples of her inventive contributions to issued patents in the PCT/US2023/073865 patent family, including the '173 patent and the '813 patent. **Exhibit 23** [8/26/2025 A. Valenti e-mail to B. Graveline]. In response, Cardiff took the position that unless Dr. Valsasina contributed to the conception of bevacizumab-naïve patent selection, she could not be a joint inventor of the '173 patent or the '813 patent (**Exhibit 24** [9/15/2025 B. Graveline e-mail to A. Valenti]) and, further, that Dr. Valsasina merely ████████ ████████████████████████████████████████████████ " **Exhibit 25** [11/19/2025 B. Graveline e-mail to A. Valenti].

87. Nerviano responded to Cardiff's legally incorrect and unsatisfactory position, highlighting the importance of this issue to Nerviano and also flagging that legal action may be required to resolve the parties' inventorship dispute:



**Exhibit 18** [10/5/2025 A. Valenti letter to B. Graveline]. Contrary to Cardiff's suggestion that joint inventorship is a strategically timed pretext for the recent termination, Nerviano had repeatedly raised its inventorship claims with Cardiff for nearly a year, but Cardiff ignored its concerns.

88. On December 18, 2025, Nerviano wrote to Cardiff again concerning its failure to identify Dr. Valsasina as a joint inventor on the '813 and '173 Patents. Nerviano identified that "████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████

█████" Nerviano pointed Cardiff to ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ (**Exhibit 3**). Nerviano concluded by asking Cardiff to provide any evidence of independent development of the conception to focus on treating this particular patient population; to date, Cardiff has not done so.

89.   It took Cardiff more than six weeks to respond to Nerviano's letter. When it did, Cardiff did not dispute that Dr. Valsasina contributed the idea of selecting for treatment with onvansertib KRAS-mutated patients with metastatic colorectal cancer; nor did it suggest that either of the two named Cardiff inventors independently conceived of treating this patient population. Instead, Cardiff took the position that Dr. Valsasina was not an inventor because, in its view, she had not "████████████ ████████████████████████." **Exhibit 20** [1/30/2026 B. Graveline e-mail to S. Alvino].  Nerviano explained that joint inventorship did not turn on conceiving of every limitation of a patent claim and because Dr. Valsasina contributed the idea of ████████████████████████████████████████████████████████ ████████, Cardiff should correct inventorship of the patents.  **Exhibit 21** [2/9/2026 D. Fishman letter to B. Graveline].

**J.    Nerviano's Notice of Material Breach and Termination**

90.   The License Agreement requires notice of material breach to the breaching party and the opportunity cure such breach within sixty days. *See* **Exhibit 4** § 11.3 [License Agreement]. If the material breach is not cured within sixty days the notifying party has the option to terminate the License Agreement without prejudice to its other rights and remedies. *Id*.

91.   After nearly eight months of raising misjoinder of inventors with Cardiff, and after learning of the abrupt management change at Cardiff, on February 18, 2026, Nerviano provided Cardiff with written notice of material breach, identifying

Cardiff's failure to correct inventorship of the '813 and '173 Patents under Section 10.2(c), and its failure to either file the requested continuation application or execute a power of attorney under Section 10.3. Nerviano requested that Cardiff cure those material breaches within sixty days—by April 19. **Exhibit 27** [2/18/2026 D. Fishman to M. Mohindru].

92.    The next day, February 19, Cardiff's counsel wrote to Nerviano, ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████. Nerviano responded by declining the invitation to withdraw its notice of material breach.  The next day, a Saturday, ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████.

93.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████.

94.    In the meantime, Nerviano became aware of Cardiff's Form 10-K SEC filing in which Cardiff reported, that "there exists a substantial doubt about [Cardiff's] ability to continue as a going concern without additional capital becoming available." **Exhibit 28** [Cardiff's February 24, 2026 Form 10-K filing (the "Form 10-K") at 19-20]. Prompted by Cardiff's concerning financial disclosures and management disruptions, coupled with the opacity of any Cardiff development activities for onvansertib, NMS wrote to Cardiff on March 6 to inquire as to development efforts it was undertaking and planning to undertake in the next two quarters. Cardiff did not

respond to these inquiries.

95.    Instead, on March 12, 2026, Cardiff wrote to NMS, again refusing to add Dr. Valsasina as an inventor, but ███████  ██████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████.

96.    ████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██ ████ ██ ████ ████ █ ████ ████ ██ █ ████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████.

97.    As discussed *infra*, the License Agreement was structured to back-end consideration so that Cardiff paid only a modest licensing fee but Nerviano would share in successful development milestones and royalties on net sales of onvansertib once approved, on the assumption that issued patents would continue to protect onvansertib after commercial launch. Cardiff's significant missteps and delays in developing onvansertib have virtually ensured that any approval and launch of onvansertib will be after the compound patent protecting onvansertib has expired. This means that Cardiff will not be able to apply for regulatory extensions (in the U.S. or ex-U.S.) on compound patents, which are generally regarded as the strongest

patents protecting a novel therapeutic. Consequently, Cardiff's development delays have significantly delayed access to patients in need such as those with mCRC and have harmed the market potential for onvansertib. This, coupled with Cardiff's failure to recognize Nerviano's ongoing contributions to later-filed patents, will effectively deprive Nerviano of any royalties even if its novel onvansertib therapeutic is one day approved and sold. Cardiff's breaches that have extended the development timeline for onvansertib while depriving Nerviano of royalties for its Licensed IP impact Nerviano's ability to fund the discovery and development of new medicines. Accordingly, at the parties' meeting, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

98.   ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

- 82 -



99.

100. The License Agreement permitted Nerviano to terminate the Agreement for cause—*i.e.*, in the event of a material breach that Cardiff failed to cure. *See* § 11.3. By April 20, Cardiff had not corrected inventorship of the patents. It had also declined to file the requested joint invention continuation application, but then also blocked Nerviano's right to do so by refusing to execute a power of attorney. Cardiff's breaches were and are material; they concerned inventorship and ownership of patent rights arising from the Nerviano's work on onvansertib, and affect the royalties and the term of any royalties that Cardiff would be obligated to share with Nerviano if onvansertib were successfully developed and commercialized. Those rights were central to Nerviano's bargain under the License Agreement. Because Cardiff did not

cure those material breaches after notice and opportunity to do so, Nerviano provided notice of termination of the License Agreement for cause on April 20, 2026. **Exhibit 29** [04/20/2026 Termination Letter].

101. On April 24, 2026, just minutes before the close of business on Friday afternoon, Cardiff contacted Nerviano and pleaded with Nerviano to withdraw its notice of termination before 5 p.m. s███████████████████████████████████████ ███████. Cardiff gave assurances that it was interested in reaching a resolution, which Nerviano believed included addressing both its IP concerns as well as its concerns about Cardiff's track-record of mismanaging the development of onvansertib. In an act of good faith, Nerviano agreed to withdraw its termination notice to provide the parties an opportunity to reach resolution of their dispute.

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. However, Nerviano reserved the right to terminate the Agreement should the parties not be able to reach resolution.

102. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

103. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████.

104. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

105. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

106.

into development decisions with respect to onvansertib because of this track record of mismanagement. Dr. Markin said that he understood Nerviano's request for objective timelines and a Board seat, but that he would need to discuss those concepts with his lawyers, including the possibility for an observer seat to the Board.

107.

108. Instead, on May 19, 2026, Cardiff filed its lawsuit. Only afterwards – on May 27, 2026 – did Nerviano serve a new termination notice to Cardiff. **Exhibit 30** [5/27/2026 Termination Letter].

**COUNT I – CORRECTION OF INVENTORSHIP**
**PURSUANT TO 35 U.S.C. § 256**

1. Nerviano realleges and incorporates by reference the allegations of paragraphs above of this Counterclaim Complaint as if fully set forth herein.

2. Under 35 U.S.C. § 256, whenever through error an inventor is not named in an issued patent, the court before which such matter is called in question may order correction of the patent to name the actual inventor or inventors.

3. Mark Erlander and Maya Ridinger are named inventors of U.S. Patent

Nos. 12,144,813 and 12,263,173 presently recorded as owned by Cardiff. A true and correct copy of the '813 Patent and '173 Patent are attached hereto as Exhibits 14 and 15, respectively.

4.   Dr. Barbara Valsasina contributed to the conception of the inventions claimed in the '813 Patent and the '173 Patent. Specifically, Dr. Barbara Valsasina conceived of selecting patients with metastatic colorectal cancer ("mCRC") who also possessed a KRAS mutation for treatment with onvansertib.

5.   To be a joint inventor, Dr. Valsasina needed only to have: "(1) contribute[d] in some significant manner to the conception or reduction to practice of the invention, (2) ma[d]e a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) do[ne] more than merely explain to the real inventors well-known concepts and/or the current state of the art." *Dana-Farber Cancer Institute, Inc. v. Ono Pharm. Co., Ltd.*, 964 F.3d 1365, 1371 (Fed. Cir. 2020) (internal citations omitted).

6.   Here, Dr. Valsasina contributed in a significant manner to conception and her inventive contribution is reflected in multiple issued claims of the '813 Patent and the'173 Patent.  For example, Claim 1 of the '813 Patent, and dependent claims 2-16 which depend therefrom, all recite "A method of treating a KRAS-mutated metastatic colorectal cancer, comprising:  (i) selecting a patient having a KRAS-mutated metastatic colorectal cancer…; and (ii) administering to the metastatic colorectal cancer patient an effective amount of onvansertib. Likewise, Claims 2, 11, and 20 of the '173 Patent each recite "A method of selecting a subject with metastatic colorectal cancer for a treatment with onvansertib and bevacizumab" " wherein the metastatic colorectal cancer is KRAS-mutated colorectal cancer."

7.   The Patent Act recognizes that "Inventors may apply for a patent jointly even though (1) they did not physically work together or at the same time, (2) each did not make the same type or amount of contribution, or (3) each did not make a

contribution to the subject matter of every claim of the patent." 35 U.S.C. § 116. Indeed, there is no "explicit lower limit on the quantum or quality of inventive contribution required for a person to qualify as a joint inventor." *Dana-Farber*, 964 F.3d at 1371.

8.     Moreover, Dr. Valsasina's contributions did more than "merely explain well-known concepts and/or the current state of the art." Rather, her inventive contributions were based on confidential preclinical and human clinical testing of onvansertib that Nerviano had developed on its own and later shared in confidence with Cardiff and Mark Erlander, a named inventor on both the '813 Patent and '173 Patents.

9.     Pursuant to 28 U.S.C. § 2201 and 35 U.S.C. § 256, Nerviano seeks an order directing the U.S. Patent and Trademark Office to correct the inventorship of U.S. Patent Nos. 12,144,813 and 12,263,173 by adding Dr. Valsasina as a named inventor.

**COUNT II – DECLARATORY JUDGMENT OF JOINT INVENTION FOR U.S.S.N. 19/94472 AND U.S.S.N. 19/412,419**

1.     Nerviano realleges and incorporates by reference the allegations of paragraphs above of this Counterclaim Complaint as if fully set forth herein.

2.     The License Agreement defines "Joint Inventions" to mean Inventions for which it is determined… that both: (i) one or more employees, consultants or agents of Nerviano or any other persons obligated to assign such Invention to Nerviano; and (ii) one or more employees, consultants or agents of Cardiff or any other persons obligated to assign such Invention to Cardiff, are joint inventors. Section 10.2(c). The License Agreement defines "Invention" to mean "any invention, improvement, modification, know-how, information or other technology that is first conceived by either or both of the Parties pursuant to work conducted under the Development Plan." Section 1.19.

3.     Dr. Valsasina contributed to the conception of Know-How and confidential information contained in the disclosures of PCT/US2023/073865, to

which both U.S.S.N. 19/94472 and U.S.S.N. 19/412,419 claim priority and rely upon for support. In addition, Dr. Barbara Valsasina conceived of treating and/or selecting for treatment with onvansertib patients with KRAS-mutated metastatic colorectal cancer ("mCRC"), which is the subject of pending claims in both applications.

4.    U.S.S.N. 19/094,472 was filed on March 28, 2025, and claims priority to PCT/US2023/073865. Pending claim 2 of U.S.S.N. 19/094,472 is directed to a method of treating a KRAS-mutated mCRC subject with onvansertib.

5.    U.S.S.N. 19/412,419 was filed on December 8, 2025, and claims priority to PCT/US2023/073865. Pending claim 2 of U.S.S.N. 19/412,419 is directed to a method of treating a KRAS-mutated mCRC subject with onvansertib.

6.    Nerviano seeks a declaration that U.S.S.N. 19/094,472 and U.S.S.N. 19/412,419 are Joint Invention applications and, further, that Dr. Valsasina should be added as a joint inventor to pending applications U.S.S.N. 19/094,472 and U.S.S.N. 19/412,419.

**COUNT III -- BREACH OF CONTRACT (BREACH OF JOINT OWNERSHIP)**

1.    Nerviano incorporates by reference the preceding paragraphs in this Complaint.

2.    At all relevant times, Nerviano was party to a valid and enforceable contract with Cardiff.

3.    At all relevant times, Nerviano performed its obligations under the contract.

4.    Under the License Agreement, Joint Inventions ("Joint Patents") shall be owned jointly between Nerviano and Cardiff: "The Parties shall jointly own all Joint Inventions (as defined below)." Section 10.2 (Ownership of Inventions). While Nerviano agreed to license its rights in such Joint Inventions to Cardiff (as part of the "Licensed IP Rights"), it retains ownership rights in any such Joint Invention. Sections 10.2(c) and 3.1 "Licensed IP Rights."

- 90 -

5. Dr. Valsasina contributed in a significant manner to the conception of the claimed methods in U.S. Patent Nos. 12,144,813 and 12,263,173, including the claimed treatment of KRAS-mutated mCRC patients with onvansertib. Those patents therefore cover Joint Inventions within the meaning of Section 10.2(c).

6. Cardiff's failure to recognize Dr. Valsasina as a joint inventor of at least the '813 and '173 patents is a material breach of the License Agreement that deprives Nerviano of joint ownership of those issued patents, as well as downstream royalties for the term of such patents. Under the License Agreement, Nerviano is only entitled to royalties on sales of onvansertib during the "Royalty Term," which itself depends on the term for which a Valid Claim remains in effect. §§ 4.2.1. and 1.34. A "Valid Claim" means a claim in an issued and unexpired patent within the Licensed IP Rights. Section 1.42. Cardiff's failure to recognize U.S. Patent Nos. 12,144,813 and 12,263,173 as Joint Inventions translates into Cardiff's failure to recognize such patents as falling within Licensed IP. The patents that Nerviano licensed as part of the License Agreement ("Nerviano Patents) in 2017 included compound patents that protected onvansertib (U.S. Pat. 8,614,220), onvansertib in therapeutic combination (including with bevacizumab) (U.S. Pat. 8,297,530), and salt forms of onvansertib (U.S. Pat. No. 8,648,078), and those patents will expire in November 16, 2030, May 6, 2030, and May 6, 2030, respectively. In contrast, the '813 and '173 patents will not expire until 2043. Cardiff's failure to recognize Dr. Valsasina as a joint inventor on the '813 and '173 patents therefore means that Nerviano's Royalty Term will be cut short by approximately 13 years.

7. The injury caused by Cardiff's material breach is further exacerbated by Cardiff's commercially unreasonable development decisions that have delayed the development and eventual approval of onvansertib such that it is extremely unlikely that onvansertib will be approved or sold during the life of the compound patent. Consequently, Cardiff's failure to recognize Nerviano's Dr. Barbara Valsasina as a joint inventor will effectively deprive Nerviano of any royalties on sales of

onvansertib – a drug that Nerviano discovered, developed, and entrusted to Cardiff.

## COUNT IV – BREACH OF CONTRACT (OBSTRUCTION OF PATENT-PROSECUTION RIGHTS)

1.     Nerviano incorporates by reference the preceding paragraphs in this Complaint.

2.     At all relevant times, Nerviano was party to a valid and enforceable contract with Cardiff.

3.     At all relevant times, Nerviano performed its obligations under the contract.

4.     Section 10.3(b) gave Cardiff the first right to file joint patent applications and to direct prosecution for Joint Inventions. At the same time, Section 10.3(b) provided Nerviano with the contractual right to file, prosecute, and maintain patent rights for Joint Inventions if Cardiff elected not do so.

5.     After Cardiff chose not to prosecute a continuation application directed to methods of treating KRAS-mutated mCRC patients with onvansertib, chemotherapy, and bevacizumab, ███████ █████ ██ █████ ██████ █, ██████████████████, it obstructed Nerviano's contractual right to file such application on its own. By refusing to execute a power of attorney thus enabling Nerviano to file and prosecute such application itself, Cardiff obstructed Nerviano's express contractual right, thereby materially breaching Section 10.3(b) of the Agreement.

6.     Cardiff's breach has harmed Nerviano by depriving Nerviano of its contractual right to protect patent rights covering Joint Inventions.

## COUNT V– BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (INTERFERENCE WITH RIGHT TO PURSUE JOINT IP PROSECUTION)

1.     Nerviano incorporates by reference the preceding paragraphs in this Complaint.

2.     Nerviano pleads this count in the alternative to Count III.

3.    At all relevant times, Nerviano was party to a valid and enforceable contract with Cardiff.

4.    At all relevant times, Nerviano performed its obligations under the contract.

5.    The License Agreement contains an implied covenant of good faith and fair dealing.

6.    The implied covenant required Cardiff not to act in a manner that would deprive Nerviano of the benefits of the License Agreement, including Nerviano's rights under Section 10.3(b) to protect patent rights covering Joint Inventions if Cardiff did not do so.

7.    Cardiff breached the implied covenant by refusing to file the requested continuation applications itself while also preventing Nerviano from filing and prosecuting the applications at its own expense.

8.    Cardiff's conduct has deprived Nerviano of the benefit of its bargain under the License Agreement.

9.    Cardiff's breach has harmed Nerviano by preventing Nerviano from protecting patent rights covering Joint Inventions.

**COUNT VI – BREACH OF CONTRACT (FAILURE TO USE COMMERCIALLY REASONABLE EFFORTS TO DEVELOP PRODUCT)**

1.    Nerviano incorporates by reference the preceding paragraphs in the Complaint.

2.    At all relevant times, Nerviano was party to a valid and enforceable contract with Cardiff.

3.    At all relevant times, Nerviano performed its obligations under the contract.

4.    Section 7.3 of the License Agreement (Development Activities) required Cardiff, using Commercially Reasonable Efforts, to conduct all additional development necessary for regulatory approval of onvansertib.

- 93 -

5. Section 7.5 of the License Agreement (Regulatory Approvals) required Cardiff to use Commercially Reasonable Efforts to obtain regulatory approvals for onvansertib in accordance with the Development Plan.

6. Section 7.9 of the contract (Development Diligence) required Cardiff to use Commercially Reasonable Efforts to conduct development activities with respect to onvansertib pursuant to the Development Plan.

7. Cardiff has breached its obligations under Sections 7.3, 7.5 and 7.9 by, *inter alia:* missing deadlines, mismanaging the development of onvansertib, only focusing on a single indication, █████████████████████████████ █████████████████████████████████ ███████████████████████████████████ ████████████████████████████.

8. Cardiff's conduct has deprived Nerviano of the benefit of its bargain under the License Agreement.

9. Cardiff's conduct has harmed Nerviano by permanently damaging the ██████████████████████████.

**COUNT VII – DECLARATORY JUDGMENT OF TERMINATION**

1. Nerviano incorporates by reference the preceding paragraphs in this Counterclaim Complaint.

2. In view of the facts alleged above, there is an actual, justiciable controversy between Cardiff and Nerviano regarding Nerviano's termination of the Agreement. Cardiff disputes that its failure to identify Dr. Valsasina as a joint inventor of the '813 and '173 patents, obstruction of its right to prosecute Joint Inventions patent application, and failure to use commercially reasonable efforts to develop onvansertib constitute material breaches of the Agreement.

3. Cardiff has materially breached at least Sections 10.2, 10.3, and 7 of the Agreement.

4. Cardiff has received notice of each of these breaches for months but has

failed to cure within the sixty days prescribed by the License Agreement.

5.     Nerviano provided notice of its termination under Section 11.3 (Termination for Cause) on May 27, 2026.

6.     Nerviano hereby seeks a judicial declaration that on or more of Cardiff's failures constitute a material breach of the License Agreement and that, consequently, Nerviano's termination of the License Agreement is valid.

**PRAYER FOR RELIEF**

WHEREFORE, Nerviano respectfully requests that the Court enter judgment in its favor and against Cardiff, dismiss Cardiff's Complaint against Nerviano, and award Nerviano the relief set forth below:

(a)     An order directing the U.S. Patent and Trademark Office, pursuant to 35 U.S.C. § 256, to correct the inventorship of U.S. Patent Nos. 12,144,813 and 12,263,173 to add Dr. Barbara Valsasina as a joint inventor;

(b)     An order declaring that Nerviano's inventor, Dr. Barbara Valsasina, is a joint inventor of at least one pending claim in each of applications U.S.S.N. 19/94472 and U.S.S.N. 19/412,419;

(c)     An order directing Cardiff to add Dr. Valsasina as a joint inventor to these pending applications pursuant to 37 CFR Section 1.48;

(d)     An order declaring that Cardiff's failure to name Dr. Barbara Valsasina as a joint inventor on U.S. Patent Nos. 12,144,813 and 12,263,173 was a material breach of the License Agreement;

(e)     An order requiring Cardiff to comply with Section 10.2(c) of the License Agreement and to cooperate in effectuating Nerviano's contractual rights by providing Nerviano with a Power of Attorney so that it may prosecute a joint invention continuation patent application claiming priority to PCT /US2023/073865;

(f)     An order finding that Cardiff has materially breached its obligation to use Commercially Reasonable Efforts to develop onvansertib;

(g)    An award of damages for the injury caused by such breach including prejudgment interest;

(h)    An order declaring the License Agreement properly terminated in view of Cardiff's material and uncured breaches;

(i)    An order directing Cardiff to specifically perform the termination obligations of Section 11.4(b) of the License Agreement;

(j)    An award of Nerviano's costs and any recoverable fees; and

(k)    Such other and further relief as the Court deems just, proper, and equitable.

Dated: June 26, 2026

Respectfully submitted,

/s/ *Deborah E. Fishman*
Deborah E. Fishman
**ARNOLD & PORTER KAYE SCHOLER LLP**
3000 El Camino Real
Five Palo Alto Square, Suite 500
Palo Alto, CA 94306-3807
Telephone: (650) 319-4500
Fax: (650) 319-4700
Email:
Deborah.Fishman@arnoldporter.com

Abigail Struthers (*pro hac vice*)
Caleb Thompson (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-7915
Fax: (212) 836-8689
Email:
Abigail.Struthers@arnoldporter.com
Email:
Caleb.Thompson@arnoldporter.com

Hannah Beiderwieden (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave, NW
Washington, DC 20001-3743

Telephone: (202) 942-5468
Fax: (202) 942-5999
Email:
Hannah.Beiderwieden@arnoldporter.com

*Counsel for Defendant Nerviano Medical Sciences S.r.l.*